—— A.2d ——

**In re JOSEPH N.**

**No. 25, Sept. Term, 2008.**

Court of Appeals of Maryland.

Feb. 19, 2009.

Piedad Gomez, Asst. Public Defender (Nancy S. Forster, Public Defender), on brief, for Petitioner.

Leslie K. Ridgway, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen.), on brief, for Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, ELDRIDGE, JOHN C. (Retired, Specially Assigned). JJ.

ADKINS, J.

In this CINA case [1] we add to earlier case law in explaining what constitutes a "change" in the terms of an order for care and custody of a CINA child for purposes of determining a parent's right to an interlocutory appeal pursuant to Maryland Code (1974, 2006 Repl Vol., 2008 Supp.), Section 12–303(3)(x) of the Courts and Judicial Proceedings Article ("CJP"). [2] We also confront the unwieldy question of mootness arising from dual track trial court and appellate proceedings that are required in order to comply with both Section 12–303(3)(x) and the requirement for review hearings by the juvenile court under Maryland Code (1984, 2006 Repl.Vol., 2008 Supp.), Section 5–326 of the Family Law Article ("FL").

We issued a writ of certiorari to consider the following question:

Did the Court of Special Appeals err in dismissing Petitioner's appeal as moot because she had not noted an appeal from an order issued at a subsequent review hearing, when that order did not change the terms of the antecedent order

---

1. A "CINA" case refers to proceedings brought pursuant to Md.Code (1974, 2006 Repl.Vol., 2008 Supp.), Subtitle 8 of the Courts and Judicial Proceedings Article ("CJP") for the protection of children "coming within the provisions of [the] subtitle." CJP § 3–802(a)(1). A "'CINA' means a 'child in need of assistance.'" CJP § 3–801(g).

2. This subsection allows a parent to take an appeal from an interlocutory order that "depriv[es] a parent ... of the care and custody of his child, or chang[es] the terms of such an order[.]"

and thus was not appealable under the *In re Billy W.* [, 387 Md. 405, 875 A.2d 734 (2005)] line of cases?

We shall hold that Petitioner had a right to an interlocutory appeal and that the appeal has not been rendered moot by orders issued at subsequent review hearings.

## FACTS AND LEGAL PROCEEDINGS

Nine-year-old Joseph was first removed from the custody of Ms. N., his natural mother and sole caretaker, in December 2005 after representatives of Child Welfare Services ("CWS"), a division of Respondent, Montgomery County Department of Health and Human Services ("the Department"), visited Ms. N.'s apartment. The CWS representatives observed that the apartment was in "poor" condition and that Ms. N. had covered the heating vents with plastic sheeting to prevent emanations of imagined poisonous gas. Ms. N. was evaluated and diagnosed as having "major depressive disorder with psychotic features." The Circuit Court for Montgomery County, sitting as a juvenile court, allowed Joseph to return to Ms. N.'s home in January 2006 after Ms. N. agreed to participate in a treatment program.

In November 2006, Housing Opportunities Commission ("HOC") and CWS workers visited Ms. N.'s apartment, observed unsanitary conditions, and discovered that Ms. N. had resumed covering her vents, was using an open oven to heat the apartment, had not attended therapy for at least two months and was not taking her medications. Joseph was placed in emergency shelter care. Joseph, then ten, was declared a CINA[3] in December 2006, and returned to Ms. N.'s custody under the protective supervision of the Department.

---

**3.** CJP Section 3–801(f) provides the following definition of a CINA:

"Child in need of assistance" means a child who requires court intervention because:

(1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and

The Department petitioned the court for another emergency shelter care proceeding in March 2007 after Department staff visited Ms. N.'s apartment and observed vents covered in one room, the oven left on and open, large amounts of dirty clothing, dirty dishes and trash strewn throughout the apartment, the presence of insects, a shortage of food, and a bathtub full of soaking clothing. Staff also detected the smell of urine in Joseph's room and observed Ms. N. disheveled, angry and aggressive. A social worker reported that she was unable to find any clean clothes for Joseph. Joseph was removed from Ms. N.'s home and placed in emergency foster care.

On March 30, 2007, the juvenile court found that Ms. N. was mentally unstable, incapable of caring for Joseph, had repeatedly violated safety plans entered into with the Department, and had not adhered to HOC Supportive Housing Program requirements. The court ordered that Joseph remain placed in the care and custody of the Department and remain placed in foster care. It granted the Department "temporary limited primary guardianship for all purposes[.]" [4] On April 3, 2007, the court then issued an order continuing Joseph's placement into the care and custody of the Department.

The juvenile court held another periodic review hearing on June 20, 2007, which is the subject of this appeal. At that hearing, the court ordered that Joseph remain a CINA. It then moved Joseph from the foster care home he entered in March 2007, and placed him in the care and custody of his father, Mr. E., under the protective supervision of the Department. The court ordered that visitation between Joseph and Ms. N. occur a minimum of once per week, supervised and under the direction of the Department. The court continued

---

(2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs.

4. Ms. N. appealed the March 30, 2007 order and the Court of Special Appeals, in an unreported opinion, affirmed on October 18, 2007.

to grant the Department "limited primary guardianship for all purposes to consent to the provision of routine medical, including mental health, and dental care services for the Child" and "reaffirmed" Joseph's permanency plan [5] of reunification.

Ms. N. appealed to the Court of Special Appeals ("COSA"), arguing that the juvenile court abused its discretion in ordering that Joseph remain a CINA, not be returned to Ms. N.'s custody immediately, and be placed instead with his father under the protective supervision of the Department. This decision, she asserted, was not supported by the evidence. The COSA, in an unreported opinion filed on January 7, 2008, dismissed Ms. N.'s appeal as moot because the juvenile court, at a December 7, 2007 review hearing, had decided that Ms.

---

**5.** Courts are required, under CJP Section 3–823(b), to determine a permanency plan for a child declared in need of assistance that has entered an out-of-home placement. In determining the child's permanency plan, courts are to decide whether the child should be reunified with the parent or guardian, placed with a relative for adoption or custody and guardianship, adopted by a nonrelative, placed in the custody and guardianship of a nonrelative, or placed in another planned permanent living arrangement that "[a]ddresses the individualized needs of the child" and "[i]ncludes goals that promote the continuity of relations with individuals who will fill a lasting and significant role in the child's life[.]" CJP § 3–823(e)(i). Courts are to evaluate the above placement options in descending order of priority, "to the extent consistent with the best interests of the child[.]" *Id.*

Under *Maryland Code* (1984, 2006 Repl.Vol., 2008 Supp.), Section 5–525(c) of the Family Law Article (FL), the local department of social services is directed to develop a permanency plan that gives primary consideration to the best interests of the child. In applying this standard, Section 5–525(e) requires the local department to consider the following factors:

(i) the child's ability to be safe and healthy in the home of the child's parent;

(ii) the child's attachment and emotional ties to the child's natural parents and siblings;

(iii) the child's emotional attachment to the child's current caregiver and the caregiver's family;

(iv) the length of time the child has resided with the current caregiver;

(v) the potential emotional, developmental, and educational harm to the child if moved from the child's current placement; and

(vi) the potential harm to the child by remaining in State custody for an excessive period of time.

N. had not made sufficient progress to award her custody.[6] The COSA reasoned that "even if [it] were to agree with [Ms. N.] that the court below erred, [its] decision would not provide her with any 'effective remedy,' as Joseph's current custodial status was decided by the December 7, 2007 review hearing, which is not under review."

At the December 7, 2007 hearing, the juvenile court ordered that Joseph remain a CINA, under the jurisdiction of the court, and remain in the care and custody of his father, under the protective supervision of the Department. The court, again, "reaffirmed" Joseph's permanency plan of reunification. It then rescinded the Department's limited primary guardianship of Joseph.

The Department's accompanying status report for the December 7, 2007 review hearing stated that "Joseph [N.'s] permanency plan of reunification was achieved on June 20, 2007." The Department's report then recommended that the court "reaffirm[ ] that plan."

On February 7, 2008, the juvenile court held another review hearing. The court granted Joseph's father full custody and closed Joseph's CINA case, upon its determination that its jurisdiction was terminated. Ms. N. appealed that order, and on January 14, 2009, the COSA issued its opinion, affirming the juvenile court.

## DISCUSSION

Courts are required, under CJP Section 3–823(h), to conduct periodic hearings to review a child's permanency plan when the child has been declared a CINA and placed in an out-of-home placement. Subsection 3–823(h)(1)(i) mandates periodic reviews "at least every 6 months until commitment is rescinded or a voluntary placement is terminated." If the court determines "that the child shall be continued in out-of-home placement with a specific caregiver who agrees to care

---

6. For further details about the December 7, 2007 hearing and the juvenile court's finding, see, *infra,* in the Discussion section.

for the child on a permanent basis[,]" the court must "conduct a review hearing every 12 months[.]" CJP § 3–823(h)(1)(ii).

We discussed the significance of the permanency plan and the periodic review process in *In re Damon M.*, 362 Md. 429, 436, 765 A.2d 624, 627–28 (2001):

> The permanency plan is an integral part of the statutory scheme designed to expedite the movement of Maryland's children from foster care to a permanent living, and hopefully, family arrangement. It provides the goal toward which the parties and the court are committed to work. It sets the tone for the parties and the court and, indeed, may be outcome determinative. Services to be provided by the local social service department and commitments that must be made by the parents and children are determined by the permanency plan. And, because it may not be changed without the court first determining that it is in the child's best interest to do so, the permanency plan must be in the child's best interest.

We elaborated on the purpose of permanency plans and periodic reviews in *In re Yve S.*, 373 Md. 551, 582, 819 A.2d 1030, 1049 (2003):

> As *In re Damon M.* observes, the purpose of a permanency plan is to set the direction in which the parent, agencies, and the court will work in terms of reaching a satisfactory conclusion to the situation. Once set initially, the goal of the permanency plan is re-visited periodically at hearings to determine progress and whether, due to historical and contemporary circumstances, that goal should be changed.

Ms. N. contends that the intermediate appellate court erred in dismissing her appeal of the June 20, 2007 permanency plan review hearing order. She asserts that it was an appealable interlocutory order under CJP Section 12–303(3)(x), which permits an appeal of an order "[d]epriving a parent, grandparent, or natural guardian of the care and custody of [her] child, or changing the terms of such an order[.]" Ms. N. argues that the court's order triggered her Section 12–303(3)(x) right to appeal because it placed Joseph with his father and had the

detrimental effect of relieving the Department of its obligation to offer services to Ms. N. in furtherance of the permanency plan to reunify her with her son. Ms. N. contends, moreover, that the COSA erroneously concluded that her appeal was moot on the basis that she did not appeal the subsequent December 7, 2007 order. This basis was improper, she argues, because the subsequent order "did not change the terms of the antecedent order and thus was not appealable under the *In re Billy W.* line of cases." [7]

## I.

### Ms. N's Right To Interlocutory Appellate Review

■ The Department challenges, for the first time, Ms. N.'s right to interlocutory appellate review of the June 20, 2007 order and moves that we dismiss her appeal. "[T]he issue of appealability is a threshold one, which may be raised at any time by a party, even on appeal, and, indeed, which must be addressed, and will be, by the Court on its own motion, whether raised or not." *Office of State Prosecutor v. Judicial Watch, Inc.*, 356 Md. 118, 125, 737 A.2d 592, 596 (1999).

A party, generally, may only "appeal from a final judgment entered in a civil or criminal case by a circuit court." CJP § 12–301. Creating an exception to that rule, Section 12–303 permits appeals from certain interlocutory orders. Among these is an order "[d]epriving a parent ... of the care and custody of [her] child, or changing the terms of such an order[.]" CJP § 12–303(3)(x).

---

7. Ms. N., in referencing the *"In re Billy W."* line of cases, cites to a series of cases in which we applied CJP Section 12–303(3)(x) and held that a court order arising from a permanency plan review hearing, to be an appealable interlocutory order, "must operate to either deprive the parent of the care and custody of his or her children or change the terms of the care and custody of the children to the parent's detriment." *In re Billy W.*, 387 Md. 405, 425, 875 A.2d 734, 745 (2005). *See also In re Karl H.*, 394 Md. 402, 430, 906 A.2d 898, 914 (2006); *In re Billy W.*, 386 Md. 675, 691–92, 874 A.2d 423, 433 (2005); *In re Samone H.*, 385 Md. 282, 315–16, 869 A.2d 370, 390 (2005).

The Department contends that the June 20, 2007 order is not appealable under the Section 12–303(3)(x) exception because it did not change the terms of the antecedent April 3, 2007 order to Ms. N.'s detriment. It argues:

[A]t all times after March 12, 2007, the date of the emergency shelter care hearing resulting in Joseph's removal from his mother's custody, Ms. N.'s custodial and visitation rights to Joseph only improved with the June 2007 order adding weekly, supervised visitation.[8] The permanency plan of reunification with Ms. N. was the first and only permanency plan in the case until February 2008, when reunification ceased to be the permanency plan, and the court closed the CINA case and granted Mr. E. full custody of Joseph.

The Department maintains that a final, appealable judgment did not exist until February 2008 "when the permanency plan changed ... from reunification with Ms. N. to a grant of full custody of Joseph to Mr. E. with the resultant closure of the CINA case[.]" *See* CJP § 3–819(e)(stating that if allegations in a CINA petition are "sustained against only one parent of a child, and there is another parent available who is able and willing to care for the child, the court may not find that the child is a [CINA], but before dismissing the case, the court may award custody to the other parent").

In *In re Samone H.*, 385 Md. 282, 291, 297, 869 A.2d 370, 375, 379 (2005), we considered the appealability of an order that denied a motion for an independent study of a parent's bond with her children, when the order was issued during a permanency plan review hearing and the plan remained static. We observed that the denial of the bonding study would only be appealable as an interlocutory order under CJP Section 12–

8. Ms. N. takes issue with the Department's assertion that the June 2007 order added weekly supervised visitation rights. At oral argument, Ms. N.'s counsel stated that Ms. N. had always had visitation rights and that the June 2007 order was merely the first one to indicate these rights on paper. The Department's status report for the June 2007 hearing supports Ms. N.'s position that she already had visitation rights prior to the June 2007 order. The report states that "Ms. [N.] attends weekly supervised visits at the Department."

303(3)(x) and concluded that the order was not appealable under that Section because it did not adversely affect the mother's parental rights or change the permanency plan terms to her detriment. *Id.* at 315–16, 869 A.2d at 390–91. We explained:

> In maintaining the permanency plan to proceed with the adoption of the children, the trial court continued the permanency plan from the prior year, as well as allowed [the mother,] Katina M.[,] increased access to her children. Katina M.'s rights would have been implicated had she made the motion for bonding study and appealed its denial when the court changed the permanency plan from reunification to adoption . . . but not when the judge continued the plan and increased visitation.
>
> We acknowledge that bonding studies can be beneficial to the determination of a permanency plan and may assist the court in making decisions about a child's placement. Nevertheless, based upon the circumstances of this case, we conclude that the trial court's order denying the motion for such a study is not an appealable final judgment and does not constitute an interlocutory order under Section 12–303[ (3)](x).

*Id.* at 316, 869 A.2d at 390 (citations omitted).

We encountered the issue of appealability again in the *In re Billy W.* cases: two related cases in which a biological parent challenged the admission of hearsay testimony within the context of a permanency planning hearing. In the first case, we declined to reach the merits of the case because the "orders, from which the appeal was taken, continuing the permanency plans for the children, [did] not constitute final judgments nor appealable interlocutory orders." *In re Billy W.*, 386 Md. 675, 677, 874 A.2d 423, 424 (2005). The challenged orders continued the commitment of the biological mother's four children to the care and custody of the Department of Social Services ("DSS"), continued permanency plans of reunification with the mother for three of her children and continued a concurrent plan of reunification and adoption for her other child. The mother argued that an order continuing

a previously established permanency plan "should be appealable because the trial court's refusal to abrogate DSS's custody of the children and to return them to her [was] a denial of her parental rights." *Id.* at 683, 874 A.2d at 428. We rejected this contention and concluded that the orders continuing the permanency plans for the children were not appealable because they did not detrimentally affect the mother's custody rights or visitation with the children. *Id.* at 692, 874 A.2d at 433.

In the second *In re Billy W.* case, both biological parents appealed permanency plan hearing orders "that maintained the extant plans for the children but changed the visitation." *In re Billy W.*, 387 Md. 405, 425, 875 A.2d 734, 746 (2005). The court's orders eliminated the biological mother's unsupervised visitation with two of the children and required the biological father to secure the services of an off-duty officer to supervise his visitation with one of the children. We concluded that the orders were appealable as interlocutory orders under CJP Section 12–303(3)(x) because they changed the terms of visitation to the biological parents' detriment. *Id.* at 426, 875 A.2d at 746. The order eliminating the mother's visitation infringed upon her "opportunities to interact with, and care for, the boys and to potentially build stronger relationships with them." *Id.* The court's requirement that the father hire an off-duty officer with his own resources constituted "a detrimental change in [his] visitation rights because the order operat[ed] as an effective denial of visitation should he not be able to afford to pay for the officer's services." *Id.*

Our most recent case on this issue is *In re Karl H.*, 394 Md. 402, 906 A.2d 898 (2006). In *In re Karl H.*, we were asked to consider whether a concurrent permanency plan order, providing for both adoption and reunification, was an appealable interlocutory order under CJP Section 12–303(3)(x). The Court of Special Appeals reasoned that the order was not appealable because " '[o]rdering the necessary preliminary steps toward the possible outcome of terminating parental rights did not deprive [Petitioner] . . . of the care and custody

of [his] children such that the juvenile court orders were appealable interlocutory orders[.]' " *Id.* at 428, 906 A.2d at 913 (citation and emphasis omitted). It, instead, characterized the juvenile court orders as simply imposing additional work on the county department of social services " 'to lay the foundation for potential adoption proceedings, including filing the guardianship petitions, serving [Petitioner] ... with required notice of the guardianship proceedings ... and seeking to identify and approve a qualified family for adoption[.]' " *Id.* (citation omitted).

We rejected this assertion that a concurrent plan of reunification and adoption did not deprive parents of their rights to care and custody of their children. The concurrent permanency plan that included the option of adoption was "sufficiently far enough along the continuum of depriving a parent of a fundamental right" and, therefore, immediately appealable. *Id.* at 430, 906 A.2d at 914. We explained:

> In determining whether an interlocutory order is appealable, in the context of custody cases, the focus should be on whether the order and the extent to which that order changes the antecedent custody order. It is immaterial that the order appealed from emanated from the permanency planning hearing or from the periodic review hearing. If the change could deprive a parent of the fundamental right to care and custody of his or her child, whether immediately or in the future, the order is an appealable interlocutory order.

*Id.*

We regarded the goals of reunification and adoption as mutually exclusive and directly contradictory, reasoning that "[r]eunification gives a parent the opportunity for reconciliation" whereas "[t]he goal of adoption ... guarantees that, under [CJP] § 3-823(g) ... after thirty days at the earliest, a petition will be filed to terminate a parent's rights along with the hope of reunification." *Id.* at 431, 906 A.2d at 914. We acknowledged the need for a concurrent plan of reunification

and adoption, but recognized the adverse affect of such a plan on a parent's rights to care and custody:

> We are not unmindful of the need for a concurrent plan of reunification and adoption; however, we find that the implementation of those goals are not parallel. When the option of "adoption" enters into a permanency plan, whether alone or with a concurrent vision, under § 3–823(g) the "local department" must file a petition for [termination of parental rights ("TPR")] within thirty days (or sixty days if the local department does not support the plan). A parent is deprived of a six-month review of the permanency plan. The six-month review is replaced with a TPR hearing when "adoption" is a component of the permanency plan. *See* § 3–823(g). An interlocutory order which includes adoption as a possible outcome has the potential both to accelerate the termination and to terminate a parent's custodial rights; therefore, such orders adversely affect a parent's rights to care and custody and entitle the parent to an immediate appeal.

*Id.,* 906 A.2d at 915.

■ The question we must answer in this appeal is whether the court's June 20, 2007 order effectuated a detrimental change to Ms. N.'s custody rights falling within Section 12–303(3)(x). Guided by the cases discussed above, we conclude that it did and is therefore immediately appealable. The court's order reaffirming a permanency plan of reunification, while shifting Joseph's physical custody from foster care to his father, did not merely maintain the status quo for Ms. N., as the Department asserts. This shift was a consequential and potentially outcome-determinative change because it potentially increased the opportunity for Joseph's father to obtain permanent custody.

When Joseph was removed from Ms. N.'s care and custody in March 2007 and placed in foster care, the Department had a statutory obligation to make reasonable efforts to reunify Joseph with Ms. N. *See* FL § 5–525(d)(1)(stating that "reasonable efforts shall be made to preserve and reunify families"

when making placement decisions). The Department was required, moreover, to give priority to Joseph's return to Ms. N. when developing a permanency plan. *See* FL § 5-525(e)(2)(requiring local departments, "[t]o the extent consistent with the best interests of the child in an out-of-home placement," to give priority to "returning the child to the child's parent or guardian, unless the local department is the guardian").

This focus on reunification with Ms. N. changed, however, on June 20, 2007, when the court moved Joseph into the care and custody of Mr. E., Joseph's father. When the court reaffirmed Joseph's permanency plan of reunification, it did not specify whether the plan was reunification with Ms. N. or reunification with Ms. N. and/or Mr. E. The Department maintains that the plan was for Joseph to be reunified *with his mother*. But a plan for reunification with only his mother, is substantively different from what the court ordered because the June 20 order expanded the universe of persons eligible for reunification to include Mr. E.

The Department's report, prepared for the December 7, 2007 review hearing, confirms that this was the order's effect by stating: "Joseph [N.'s] permanency plan of reunification *was achieved on June 20, 2007.*" (Emphasis added.) This statement is, in essence, recognition by the Department that the court implicitly changed Joseph's permanency plan: the Department's focus was no longer limited to making reasonable efforts to reunify Joseph with Ms. N. and was instead, broadened to facilitate Joseph's reunification with either his mother or his father.

This order represented a meaningful shift in direction vis a vis Ms. N., and possible restoration of her rights to parent. The court's June 2007 placement did not immediately award Mr. E. full custody of Joseph or conclusively foreclose Ms. N.'s reunification with her son. But the order had the potential to facilitate and accelerate a grant of full custody to Mr. E. because it implicitly recognized Mr. E.'s availability, willingness, and provisional ability to care for Joseph. Mr. E.'s

circumstances trigger the application of CJP Section 3–819(e), which calls for closing CINA proceedings when one parent meets these criteria.

CJP Section 3–819(e) provides:

*Allegations sustained against only one parent.*—If the allegations in the petition are sustained against only one parent of a child, and there is another parent available who is able and willing to care for the child, the court may not find that the child is a child in need of assistance, but, before dismissing the case, the court may award custody to the other parent.

*See also In re Sophie S.,* 167 Md.App. 91, 105, 891 A.2d 1125, 1133 (2006)(holding that a juvenile court could not adjudicate a child a CINA if there was one parent who was able and willing to provide custody); *In re Russell G.,* 108 Md.App. 366, 380, 672 A.2d 109, 116 (1996)(same). Of special interest in this case is the juvenile court's Section 3–819(e) authority, upon closing the CINA case, to "award custody to the other parent."

The Department did not request that the court dismiss Joseph's CINA case and award full custody to Mr. E. at the June 20 hearing, but giving him temporary custody under the Department's supervision was a preliminary step in that direction. If that temporary custody arrangement worked well, it was likely the juvenile court would take the next step and award Mr. E. full custody, dismissing the CINA proceeding as it was obligated to do under Section 3–819(e). This could be done even if Ms. N. had not received the full reunification services that the Department could provide.

So, the juvenile court's determination that Mr. E. was available, willing, and able enough to care for Joseph [9]—albeit

---

9. The Department's status report for the June 20th hearing, when discussing Mr. E.'s weekly supervised visits with Joseph, indicated that "Mr. [E.] reassured Joseph that he loved him and would not have allowed him to be placed in foster care if he knew Joseph was going to be removed from Ms. [N.'s] care and custody." The report also stated that "Mr. [E.] was attentive, showed emotional interest, and connection

under the Department's supervision—increased the difficulty Ms. N. faced in her effort to be reunified with Joseph. The June 20 order was a pivotal change in the direction of Ms. N.'s permanent loss of custody because it set the stage for the court's dismissal of Joseph's CINA case and an award of full custody in favor of Mr. E.

The June 20 order was also consequential and potentially outcome-determinative on the question of permanent custody because of the bonding and attachment that could take place between Joseph and Mr. E. during his placement into his father's provisional care and custody. In *In re Samone H.*, we described bonding as:

"[T]he forming of a mutual emotional attachment between parent and child. [T]he giving of unconditional love by the parent to the child. [T]he development of an emotional connection between parent and child. [T]he development of a sense of security for the child. [T]he establishment of an emotional intimacy and sense of closeness between parent and child. [T]he beginning step in helping the child to feel a healthy self-worth and self-esteem. [T]he transmission of familial ties between child and parent through which non-verbal communication and understanding takes place. [A] means of providing the child with a sense of belonging to a family. [A] way of bringing the child into the larger network of caring and love present in the parent's extended family. [T]he concern and love for the child by the parent, and for the parent by the child, which is exhibited in all aspects of both their lives."

385 Md. at 307, 869 A.2d at 384–85 (quoting James J. Messina & Constance Messina, *Tools for Parents of . Children with Disabilities and Special Needs: Bonding with Your Child* 1 (2004)). Courts are "to consider the factors specified in § 5–525(e)(1) of the Family Law Article" when determining a child's permanency plan. CJP § 3–823(e)(2). The factors for

---

with Joseph" during his visits and that "Mr. [E.][had] no criminal charges or convictions[.]" On this finding, the Department recommended that Mr. E. have unsupervised visits with Joseph.

consideration under FL Section 5–525(e) include "the child's attachment and emotional ties to the child's natural parents[,]" "the child's emotional attachment to the child's current caregiver[,]" and "the length of time the child has resided with the current caregiver[.]"

The Department asserts that "the periodic review hearing held on February 7, 2008, fully preserved and realized Ms. N.'s right to appeal the order that did adversely affect her custody rights after the court's grant of full custody to Mr. E." The Department overlooks, however, the relative disadvantage Ms. N. would incur in her effort to be reunified with Joseph were we to delay her right to appeal until the court's grant of full custody. There would be months to establish an emotional attachment between Mr. E. with Joseph while the child was in Mr. E.'s provisional custody. Joseph's time with his natural father and resulting emotional attachment may very well have been instrumental in tipping the custody scales in favor of awarding full custody to Mr. E.

For the reasons explained above, we hold that Ms. N. possessed the right to maintain an interlocutory appeal from the Circuit Court's June 20, 2007 order awarding temporary custody to Mr. E., subject to the Department's supervision. This holding does not complete our assignment, though, because we must address the Department's argument that her appeal became moot when the juvenile court undertook a review hearing on December 7, 2007, and continued that arrangement.

## II.

### Whether Ms. N.'s Appeal Was Properly Dismissed As Moot

At the December 7, 2007 review hearing, the juvenile court reviewed reports from the Department saying that Ms N.'s psychiatrist reported that Ms. N. was attending her appointments and appeared to be taking her prescribed medication. The Department also related to the court that Ms. N.'s therapist reported she was compliant with her mental

health treatment; her mood had improved; and that she was not having symptoms of depression, mania, or psychosis. The Department's own view was different, however. It asserted that Ms. N. had "not consistently demonstrated mental stability during her visitation with Joseph. She [had] illustrated symptoms of delusion, irritability, mistrust and irrational behavior."

A psychiatrist engaged by the Department, Dr. Haller, who interviewed Ms. N. twice, indicated in a June 14, 2007 report that during the interviews, she was "alert, lucid, and fully oriented. There was no evidence of hallucinations nor current delusions. Her fund of information was adequate in that she was able to name the last three presidents. No deficits were noted in her memory. She was able to abstract appropriately. She denied any hallucinations." Dr. Haller also spoke with a social worker in the Department, who advised him that Ms. N. does not do well when she is off her medication, and with her treating psychiatrist, who indicated that Ms. N.'s mental state varies, and that she was taking Lexapro and Depakote as prescribed, but declined to take a prescribed antipsychotic medication.

Dr. Haller concluded as follows:

[Ms. N.'s treating psychiatrist] recommended treating her with an antipsychotic, a mood stabilizer and an anti-depressant, on a presumptive diagnosis of bipolar disorder NOS. Ms. [N.], apparently took the latter of two medications for a while although she takes only Lexapro currently according to what she told you. Moreover, your check of her medication bottle shows she is not taking the medication as frequently as prescribed. She has gotten well enough that she can at least verbalize that she was having problems with reality orientation in the past and that she now recognizes that the vents do not need to be covered. However, she has not improved to a degree where she is able to recognize her prior behaviors as being irrational. Rather, she attempts to rationalize what she did. This indicates her reality testing is still significantly impaired.

Furthermore, she is not taking the medications which are necessary for her continued mental health It is not clear to me whether the thyroid disease caused, contributed to, or is irrelevant to her psychiatric condition Ms. [N.] should not have any contact other than supervised visitation with Joseph until she provides a letter from her endocrinologist stating that no further treatment is necessary or that Ms. [N.] is taking whatever medication is required on *a regular basis.*

Another reason for only supervised contact is that Ms. [N.'s] condition of psychosis is a recurring one. It is treatable with medication. However, her attitude toward taking medication does not indicate an appreciation of her need for it. For example, she said she can't tolerate the anti-psychotic medications whereas [her treating psychiatrist] said Ms. [N.] has refused them. Regular use of psychiatric medications is absolutely necessary to control her delusional beliefs. If she will not take such, then her condition will likely eventually deteriorate again. If her psychosis is because of a bipolar disorder then Depakote might be sufficient. However, since she is not taking this medication, either, she is, again, at risk of further deterioration into psychosis in very short order. The one medication, she is taking, albeit irregularly, is Lexapro, which is an antidepressant. Taking this medication without concurrent use of a mood stabilizer, such as Depakote, or an antipsychotic can lead to an exacerbation of her illness, if she has bipolar disorder. If she has a paranoid disorder without mood symptoms, then she needs an antipsychotic.

I did not see any mood symptoms during my examination but I did see evidence of partially compensated psychosis. Therefore, I believe Ms. [N.] needs to take an antipsychotic.

In short, I find Ms. [N.] to still show signs of psychosis. She is better than when Joseph was removed from her care. However, she is not well enough grounded in reality to resume child care duties. In order to have any hope of regaining the sufficient degree of mental health necessary to resume her role as primary parent, she must be willing to

take *all* the medications as prescribed by her physicians. If she continues to refuse to do so, consideration should be given to termination of parental rights.

(Emphasis in original.)

In its report to the juvenile court prepared for the December 7, 2007 review hearing, the Department recommended that "[s]ince Ms. [N.] has not been mentally stable or consistently taking her medication as prescribed," that the child be placed in the care and custody of his father, and the case closed. The court rejected this recommendation, concluding that "it would not be in the Child's best interest to terminate the Department's obligations and responsibilities before some family therapy occurred between mother and Child." The court continued Joseph's placement with his father, under the protective supervision of the Department.

When the COSA dismissed Ms. N.'s appeal as moot, it reasoned that "the June 20, 2007 review [had] been superseded by a subsequent order of [the juvenile court] finding that, in the ensuing period of June 21, 2007, until December 7, 2007, [Ms. N.] had still made insufficient progress to warrant restoring custody to her." It added that "even if [it] were to agree with [Ms. N.] that the court below erred, [its] decision would not provide her with any 'effective remedy,' as Joseph's current custodial status was decided by the December 7, 2007 review hearing, which is not under review." The court below then declined to review the merits of Ms. N.'s appeal under the mootness exception for cases involving matters of important public concern because it presented "no legal issue of public importance."

Ms. N. asserts that the court erred in dismissing her appeal on this basis because it was requiring her to appeal the December 7, 2007 order—an order that did not change the terms of Joseph's care and custody and consequently was not appealable under CJP Section 12–303(3)(x).[10] Ms. N. also

---

10. The December 7, 2007 order continued Joseph's CINA status and placement with his father while "reaffirming" Joseph's permanency plan of reunification.

argues that her appeal presents "no question of mootness" because

[an] appellate ruling that the trial court erred on June 20, 2007, in refusing to return the child to the mother, would plainly require that upon appropriate motion the outcome of the December 7, 2007 hearing would be reversed as well, and remanded ... for a new hearing guided by the reasoning of the appellate court.

The Department asserts that the COSA properly dismissed Ms. N.'s appeal as moot because events that occurred after June 20, 2007 rendered unnecessary the resolution of the merits issue in the case, *i.e.* "whether the juvenile court had sufficient evidence in June 2007 to support its conclusion that Ms. N. had made insufficient progress in resolving her mental health issues to permit returning the child to her care." It argues:

Ms. N.'s mental health progress by December 2007 was nonexistent and, at that time, the court could not restore custody to her because of that lack of progress, and the fact that she was not taking her psychotropic medication. It would have served no purpose, therefore, for the intermediate appellate court to review the sufficiency of evidentiary support for an action of the juvenile court that occurred more than a year before, and which subsequent events (including a final ruling on custody) have now overtaken.

We are a bit puzzled by this response. Ms. N.'s treating psychiatrist and treating therapist prepared a joint letter for the December 7, 2007 review hearing. This letter, submitted in conjunction with the Department's report to the juvenile court, stated:

We are writing this letter at your request in order to assist with the Court hearing that is scheduled for December 7, 2007.

Ms. [N.] regularly attends her therapy appointments and meets with her treating psychiatrist ... for periodic evaluation and medication monitoring. As per her own report,

and writer's clinical impression, she is taking the medication she is prescribed.

Ms. [N.] has a history of mood disorder which has improved with medication and therapy. She is currently free of symptoms of depression, mania or psychosis.

She is well kempt, makes good eye contact and is oriented to all spheres. She continues to be open, direct and honestly discusses her concerns in sessions.

Ms. [N.] consistently expresses her wish to have her son live with her so that she can participate more closely in his education and life. She has been able to work so that she is self-supporting.[ ]

In summary, we believe that Ms. [N.] is currently psychiatrically stable and asymptomatic.

Thus, according to this report, and contrary to the Department's argument, Ms. N. was taking her prescribed psychotropic medications.[11] Dr. Haller, the psychiatrist engaged by the Department, did not negate this; he only reported that as of June 14, 2007—nearly six months prior to the December 2007 review hearing—Ms. N. declined to take the antipsychotic medicine her doctor had recommended. The Department also inaccurately states that Ms. N.'s mental health progress by December 2007 "was non-existent[.]" Rather, as of the December 2007 review hearing, her treating psychiatrist and therapist reported that she had "improved with medication and therapy" and was "currently free of symptoms of depression, mania or psychosis." Thus, Ms. N.'s compliance may have improved between June 2007 and December 2007.

Moreover, contrary to the Department's suggestion, the court did not make any specific finding about her mental health in its December 7, 2007 order. The court just said that "it would not be in the Child's best interest to terminate the Department's obligations and responsibilities before some

---

11. "Psychotropic" medicine means a drug "[h]aving an altering effect on perception, emotion, or behavior." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1415 (4th ed.2000).

family therapy occurred between mother and Child." [12] Thus, it does not appear as if the court undertook the task of revisiting everything that transpired at the June hearing or that was included in the June order. This may have been because the court sought to be careful not to interfere with any issue then pending in Ms. N.'s interlocutory appeal.

"[T]he doctrine of mootness applies to a situation in which past facts and occurrences have produced a situation in which, without any future action, any judgment or decree the court might enter would be without effect." *Hayman v. St. Martin's Evangelical Lutheran Church*, 227 Md. 338, 343, 176 A.2d 772, 775 (1962). "A case is moot when there is no longer an existing controversy between the parties at the time it is before the court so that the court cannot provide an effective remedy" and generally, a "moot case is dismissed without our deciding the merits of the controversy." *Coburn v. Coburn*, 342 Md. 244, 250, 674 A.2d 951, 954 (1996).

We have confronted the issue of mootness in other CINA cases involving appeals from periodic review hearing orders. In *In re Emileigh F.*, 355 Md. 198, 733 A.2d 1103 (1999), a child was placed with the maternal grandmother after being adjudicated a CINA. After an evidentiary hearing, the juvenile court ordered that custody of Emileigh F. be given to her father. While the mother's appeal from this order was pending, the Department filed a motion to terminate the juvenile court's jurisdiction because the child had been placed with the father. The court granted that motion on the grounds that she was no longer a CINA because the father was " 'willing and able, and ha[d] proven since he' [d] had custody of Emileigh ... about a year and three months ... and there [were] absolutely no issues.' " *Id.* at 201, 733 A.2d at 1104.

On appeal, writing for the Court, Judge Irma S. Raker explained:

---

12. It also directed that Ms. N. "[f]ollow all of the treatment recommendations of her doctors, to include taking all medications as prescribed by her doctors[.]"

To be sure, the State is correct that the juvenile court had fundamental jurisdiction, *i.e.*, the power residing in a court to determine judicially a given action, or question presented to it for a decision, over the subject matter of the proceedings. We are not here talking about the concept of fundamental jurisdiction, but rather the propriety of the exercise of that jurisdiction. *After an appeal is filed, a trial court may not act to frustrate the actions of an appellate court. Post-appeal orders which affect the subject matter of the appeal are prohibited.*

*Id.* at 202–03, 733 A.2d at 1105 (citations omitted, emphasis added).

We determined that the closure of the CINA proceeding interfered with the appeal from the custody order:

In the instant case, the action taken by the juvenile court addressed matters that were clearly involved in the pending appeal. The court's action in closing the CINA case and thereby terminating that court's jurisdiction, if permitted, would in essence defeat the right of [the mother] to prosecute her appeal with effect. We hold that the juvenile court's actions were inconsistent with the pending appeal and were prohibited. Accordingly, the juvenile court shall vacate the judgment closing the CINA proceedings, conduct a review hearing, and determine anew as of the time of the hearing the placement for the care and custody of Emileigh F.

*Id.* at 204, 733 A.2d at 1105.

The procedural difference between *In re Emileigh F.* and the present case is that here, the juvenile court conducted the December 7, 2007 review hearing while Ms. N.'s interlocutory appeal from the June 20, 2007 order was pending, but did not close the CINA case as a result of that hearing. This December review hearing, and the resulting order, gives the Department some comfort in advancing its argument that the review hearing order superseded and made moot the issues then on appeal from the June order. But, under *Emileigh F.*, the appeal cannot be made moot by a subsequent order that

usurped for the juvenile court the role properly reserved to the appellate court, *i.e.* to decide the issues raised by the appellant in the interlocutory appeal. *See id.* at 202–03, 733 A.2d at 1105.

In *In re Justin D.*, 357 Md. 431, 745 A.2d 408 (2000), a case relied upon by the COSA, in which two CINA proceedings had been consolidated, two mothers sought review of periodic review hearing orders issued in January 1999. At oral argument, we were advised that the juvenile court had entered similar orders in July 1999, following scheduled review hearings, from which no appeals were taken. The substantive issue in the appeal involved a challenge to the validity of orders that appeared to give DSS unfettered discretion to decide a child's visitation schedule. *Id.* at 434, 745 A.2d at 410. We recognized that the subsequent July orders presented a "troublesome" mootness issue:

> Notwithstanding appellants' assertion to the contrary at oral argument, we do not have some sort of inherent authority to vacate separate, independent orders or judgments from which no appeal has been taken. Appeals could have been filed from the later orders, which would have brought their validity before us. In the absence of such appeals, there is really no effective relief that we can grant with respect to the orders that *are* before us. They have been superseded and are no longer in effect; vacating them will provide no relief whatever to appellants. The appeals are clearly moot and, ordinarily, would be dismissed on that ground.

*Id.* at 444, 745 A.2d at 415. We concluded, however, that it was appropriate to apply a limited exception to the mootness doctrine:

> It is clear from the record, however, and the parties have agreed, that it is common practice for the juvenile court . . . to enter orders of this kind, so the issue presented by appellants is a recurring and important one. With periodic six-month reviews, orders of this kind that are appealed will almost always be replaced by subsequent orders before this Court will have the opportunity to review them. We have

recognized a very limited exception to the mootness doctrine in this kind of situation and have held that

if the public interest clearly will be hurt if the question is not immediately decided, if the matter involved is likely to recur frequently, and its recurrence will involve a relationship between government and its citizens, or a duty of government, and upon any recurrence, the same difficulty which prevented the appeal at hand from being heard in time is likely again to prevent a decision, then the Court may find justification for deciding the issues raised by a question which has become moot, particularly if all these factors concur with sufficient weight.

*Id.* at 444–45, 745 A.2d at 415–16 (quoting *Lloyd v. Board of Supervisors of Elections of Baltimore County*, 206 Md. 36, 43, 111 A.2d 379, 382 (1954)).

We do not view this case as one in which it is necessary to address the merits of the appeal by way of the limited exception to the mootness doctrine as in *In re Justin D.* This case is more appropriately resolved under the principles of *In re Emileigh F.* because here, we have the residual effect of the June 20, 2007 order, as discussed in Section I, on the ongoing and ultimate determination of custody. This CINA appeal is not moot because a controversy is alive when the subsequent review hearing order may have been influenced by an error made in the earlier review hearing order. The circumstances here are more like those in *In re Kaela C.*, 394 Md. 432, 464–65, 906 A.2d 915, 933–34 (2006), a CINA case, in which we declined to find an appeal moot, even though the Maryland juvenile court had transferred the case to a California court, which had then assumed jurisdiction. The case was not moot, we said, because of the collateral consequences the mother continued to suffer from the erroneous Maryland judgment: the California court had relied upon the Maryland juvenile court's judgment awarding custody to the father because he was available, willing, and able to assume custody, when the mother was not, in making its own custody determinations adverse to the mother. *Id.* at 448–49, 463–65, 906 A.2d at 924–25, 933–34. Because California had assumed jurisdiction,

we had limited remedies at that point, but we reversed the COSA, and remanded the case to it with instructions that the juvenile court decision be dismissed, "thereby relieving [the mother] of the collateral consequences she continue[d] to suffer from the Maryland judgment." *Id.* at 476, 906 A.2d at 941.

Applying the principles of *In re Kaela C.,* we conclude that the June 20, 2007 review hearing order had consequences for Ms. N. that may well have affected the juvenile court in its December 7, 2007 and February 7, 2008 review hearing orders for the reasons we discuss in Section I. These consequences could be termed direct or collateral. Regardless of label, it is these consequences that preclude this appeal from being moot.

■ Moreover, if we were to reach the opposite conclusion—that interlocutory appeals from orders changing the terms of an earlier order for care and custody of a CINA child would be rendered moot whenever the court conducted a subsequent review hearing—we would be violating the rule of *In re Emileigh F.* This is so because we would, in essence, authorize juvenile courts to "act to frustrate the actions of an appellate court." *In re Emileigh F.,* 355 Md. at 202, 733 A.2d at 1105. As we said there, "[p]ost-appeal orders which affect the subject matter of the appeal are prohibited." *Id.* at 202–03, 733 A.2d at 1105. This rule applies whether the appeal is interlocutory or not.

### Disposition

We recognize that providing a remedy for a parent who has brought such an interlocutory appeal in a CINA case can be difficult. A child's life does not go on hold just because an appeal is pending, and the juvenile court will continue to make decisions consistent with the child's best interests. The Petition for Writ of Certiorari in this case did not include the merits of Ms. N.'s appeal from the June 20, 2007 order. Thus, in addition to reversing the COSA decision, we will remand this case to the COSA so that court can make a decision on the merits of her appeal from the June 20, 2007 order. Because

the COSA recently issued its opinion with respect to Ms. N.'s appeal from the juvenile court's February 7, 2008 order closing the CINA case and awarding custody to Joseph's father, we direct the COSA to reconsider both its decision in the appeal from the June 20, 2007 order, and from the February 7, 2008 order, in light of this opinion. If necessary, it shall withdraw its mandate issued on January 29, 2009 in the appeal from the February 7, 2008 decision.

On remand, should the COSA conclude that the juvenile court committed no error in its June 20, 2007 decision adjudging Ms. N. incapable of caring for Joseph, nor any error in the juvenile court's February 7, 2008 award closing the case and awarding custody to the father, it need not remand the case to the juvenile court for further proceedings.

If, on the other hand, the COSA determines there was error in the June 20, 2007 decision by the juvenile court, the COSA should remand the case to the juvenile court for further determinations consistent with its opinion. If that occurs, it should direct the juvenile court to consider Ms. N.'s ability to care for Joseph in June 2007, along with her ability to care for him in the time period that followed, in developing a plan that is in Joseph's best interests. *See* FL § 5–525(e)(i)(including as factor "the child's ability to be safe and healthy in the home of the child's parent"). It should also direct the juvenile court to "give a fresh consideration to the entire situation, including [the mother's] current mental health as it bears on a proper plan for [her child]." *In re Yve S.*, 373 Md. 551, 625, 819 A.2d 1030, 1073 (2003).

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY RESPONDENT.**