*In re: J.R.,* No. 459, September Term 2019.

**INFANTS > DEPENDENCY, PERMANENCY, AND RIGHTS TERMINATION**

On review of child in need of assistance (CINA proceedings), the juvenile court's factual findings are reviewed for clear error.

**INFANTS > DEPENDENCY, PERMANENCY, AND RIGHTS TERMINATION QUESTIONS CONSIDERED**

On review of child in need of assistance (CINA proceedings), whether the juvenile court erred as a matter of law is determined without deference and if an error is found, the appellate assesses whether the error was harmless or if further proceedings are required.

**INFANTS > DISCRETION OF THE COURT**

On review of child in need of assistance (CINA proceedings), the appellate court gives deference to the juvenile court's ultimate decision and will reverse only for abuse of discretion.

**INFANTS > IN GENERAL**
**NATURE AND PURPOSE**
**CHILD ABUSE REPORTS AND INVESTIGATIONS**
**STATUTES > LANGUAGE AND INTENT, WILL, PURPOSE, OR POLICY**

Federal and state legislative history sanction the general use of safety plans, which is a nationally accepted practice utilized by Departments of Social Services in dealing with and responding to referrals for abuse or neglect.

**INFANTS > IN GENERAL; NATURE AND PURPOSE; CHILD ABUSE REPORTS AND INVESTIGATION**

The Department of Social Services has utilized safety plans for decades in CINA proceedings in Maryland; this practice is statutorily authorized as an "alternative response" in Child Protective Services investigations. Family Law, § 5-706(a); (l)—(t).

**INFANTS > IN GENERAL; NATURE AND PURPOSE; CHILD ABUSE REPORTS AND INVESTIGATION**

While "safety plan" is not defined in the Family Law Article, COMAR or any Maryland case law, it's plain meaning can be inferred from the statute, in that the Department of Social Services can use safety plans as one of the various mechanisms to provide appropriate services in the best interest of the child. Family Law, § 5-706(s)(11)(i).

**INFANTS > CHILD ABUSE REPORTS AND INVESTIGATIONS**

The no-contact terms in a safety plan is valid if the term is implemented as an appropriate service in the best interest of the child. Family Law, § 5-706(s)(11)(i).

**INFANTS > CHILD ABUSE REPORTS AND INVESTIGATIONS**

The correct standard in determining whether a department can remove a child temporarily is whether the representative believes that the child is in serious, immediate danger. Family Law, § 5-709(c).

**INFANTS > CHILD ABUSE REPORTS AND INVESTIGATIONS**

While safety plans are only authorized for alternative response and low risk cases, the statute is very clear that the Department of Social Services has great latitude in determining whether they will employ an investigation or an alternative response in their evaluation of child abuse or neglect, absent the exceptions found in Family Law, § 5-706(p) or cases determined to fall under Family Law, § 5-706(n).

**STATUTES > INTENT**

When ambiguity clouds the precise application of a statute, the cardinal rule of statutory construction is to ascertain and effectuate legislative intent.

**STATUTES > LANGUAGE AND INTENT, WILL, PURPOSE OR POLICY**

We divine legislative intent from the entire statutory scheme, as opposed to scrutinizing parts of a statute in isolation.

**INFANTS > CHILD ABUSE REPORTS AND INVESTIGATIONS**

Absent a clear definition of low risk, federal legislation, Maryland's declaration that the health and safety of children be of paramount concern and the flexibility granted by the Maryland General Assembly to the Department of Social Services leads to a determination that the legislature intended low risk to be within the scope of the Department of Social Services' judgment in assessing whether an alternative response is the appropriate step in considering allegations of child abuse and neglect.

**INFANTS > CHILD ABUSE REPORTS AND INVESTIGATIONS**

The evidence supporting removal was sufficient for the Department of Social Services to believe that a three-month-old child was in immediate or imminent, serious danger when initial allegations of medical neglect led to substantiated claims of substance abuse and domestic violence; the temporary removal was an appropriate service in response to violations of the valid safety plans and the plan's legal terms.

**INFANTS > DISMISSAL AND MOOTNESS**
**PRESERVATION**

A question is moot if there is no longer an existing controversy between the parties, so that there is no longer any effective remedy which the court can provide.

**INFANTS > PROTECTIVE CUSTODY AND REMOVAL OF CHILD**

Under the collateral order doctrine, denied petitions for continued shelter orders are appealable as interlocutory orders.

**INFANTS > PROCEEDINGS**

Shelter care only address the short, provisional arrangements for a child during the pendency of CINA proceedings. Md. Code Ann., Cts. & Jud. Proc. § 3-815.

**INFANTS > PROCEEDINGS**

A CINA adjudication and disposition, along with subsequent orders associated with CINA determinations deal with the permanent aspects of a child's custody and care.

**INFANTS > DISMISSAL AND MOOTNESS**
**PRESERVATION**

The merits of temporary, shelter care orders are moot once a CINA determination has been made, as there is no relief an appellate court can effectively grant a party; shelter care orders are no longer applicable after a CINA disposition.

**STATUTES > MANDATORY OR DIRECT STATUTES**

When legislature commands that something be done, using words such as "shall" or "must" rather than "may" or "should," the obligation to comply with statute or rule is both mandatory and directory; the relevant question in such cases is whether the sanction sought for noncompliance is the appropriate one.

**CONSTITUTIONAL LAW > PARENT AND CHILD RELATIONSHIP**

The constitutional protections in the Fourteenth Amendment that guarantee a parent's right to be free from undue interference by the state are imperative, but they are not absolute. U.S. Const. Amend. 14.

**INFANTS > DEPRIVATION, NEGLECT OR ABUSE**

The principal focus of the CINA statute is to ensure that juvenile courts (and local departments of social services) exercise authority to protect and advance a child's best interests when court intervention is required.

**EVIDENCE > PREPONDERANCE OF THE EVIDENCE**

The standard employed by the trial court in determining whether a child has been neglected is preponderance of the evidence; this standard is measured against the totality of the circumstances. Ann. Md. Code, Courts and Judicial Proceedings, § 3–817(c).

**INFANTS > DISCRETION OF THE COURT**

Trial courts have wide discretion concomitant with plenary authority to determine any question concerning the welfare of children.

**INFANTS > DEPRIVATION, NEGLECT OR ABUSE**

Evidence of medical neglect along with corroborated concerns of drug use and domestic violence allegations support juvenile court's findings that mother and father neglected the child by failing to give proper care and attention to the child.

**INFANTS > DEPRIVATION, NEGLECT OR ABUSE**

Juvenile court are required to conduct a disposition hearing that is distinctly separate from the adjudication hearing. Ann. Md. Code, Courts and Judicial Proceedings, § 3–819.

**INFANTS > DEPENDENCY, PERMANENCY, AND RIGHTS TERMINATION DEPRIVATION, NEGLECT OR ABUSE**

A more stringent standard of proof is required to deny custody than is to find a child CINA.

**INFANTS > DEPENDENCY, PERMANENCY, AND RIGHTS TERMINATION DEPRIVATION, NEGLECT OR ABUSE**

The law permits involuntary separation of a child from his parents only if the parents are unable or unwilling to give the child ordinary care and attention, and even then only if the court finds that the drastic remedy of removing the child is necessary for his welfare.

**INFANTS > RIGHT TO COUNSEL**

Right to counsel in CINA proceedings is afforded by statute. Cts. & Jud. Proc. § 3-813(a).

**INFANTS > EFFECTIVENESS OF COUNSEL**

Implicit in the right to counsel is that counsel be effective.

**INFANTS > EFFECTIVENESS OF COUNSEL**

*Strickland* extensively outlines the standard for evaluating the validity of an ineffective assistance of counsel claim, which can be broken down into a performance component and a prejudice component.

**INFANTS > EFFECTIVENESS OF COUNSEL**

In regard to performance, there must first be a showing that counsel's representation fell below an objective standard of reasonableness.

**INFANTS > EFFECTIVENESS OF COUNSEL**

Review of an attorney's performance is context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.

**INFANTS > EFFECTIVENESS OF COUNSEL**

After a showing that performance was deficient under the *Strickland* test for claim of ineffective assistance of counsel in a CINA proceeding, one claiming error must then demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

**INFANTS > EFFECTIVENESS OF COUNSEL**

The prejudice prong of the *Strickland* test requires a showing of prejudice, considering that attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial.

**INFANTS > EFFECTIVENESS OF COUNSEL**

It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.

**INFANTS > EFFECTIVENESS OF COUNSEL**

In Maryland, to establish prejudice, there must be a showing that but for counsel's errors, there is a substantial possibility the result of the proceeding would have been different.

**INFANTS > EFFECTIVENESS OF COUNSEL**

Post-conviction proceedings are preferred with respect to ineffective assistance of counsel claims because the trial record rarely reveals why counsel acted or omitted to act, and such proceedings allow for fact-finding and the introduction of testimony and evidence directly related to allegations of the counsel's ineffectiveness.

**INFANTS > EFFECTIVENESS OF COUNSEL**

Where the critical facts are not in dispute and the record is sufficiently developed to permit a fair evaluation of a claim of ineffective assistance of counsel in termination of parental rights proceeding, there is no need for a collateral fact-finding proceeding, and review on direct appeal may be appropriate and desirable.

**INFANTS > EFFECTIVENESS OF COUNSEL**

The trial record clearly must illuminate why counsel's actions were ineffective because, otherwise, the Maryland appellate courts would be entangled in the perilous process of second-guessing without the benefit of potentially essential information.

Circuit Court for Cecil County
Case No. C-07-JV-18-000163

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 459

September Term, 2019

On Motion for Reconsideration

_____

In Re: J.R.

_____

Berger,
Nazarian,
Reed,


JJ.

_____

Opinion by Reed, J.

_____

Filed:  July 24, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

Following the adjudicatory and dispositional hearings, the Circuit Court for Cecil County, sitting as a juvenile court, found J.R.[1] to be a Child in Need of Assistance ("CINA"). Both the biological mother, Ms. B. ("Appellant Mother"), and biological father Mr. R. ("Appellant Father"), appealed, and they present four questions for our review, which we have expanded and rephrased for clarity:[2]

> I. Did Cecil County Department of Social Services err when it failed to follow the statutory scheme for handling a CINA case by implementing "safety plans", which Appellant Mother alleges are not authorized by the statute?
>
> II. Did the juvenile court err as a matter of law when it continued the shelter care orders?
>
> III. Did the juvenile court err when it found that J.R. was a CINA?
>
> IV. Did the juvenile court err when it did not conduct a separate dispositional hearing?
>
> V. Does Appellant Mother have a valid claim for ineffective assistance of counsel?

---

[1]     To respect and protect the privacy of the child involved in this matter, they will be referred to by their initials.

[2]     Appellant Mother presents the following questions:

1. Did the juvenile court follow the statutory scheme when handling this CINA case?

2. Did CCDSS follow the statutory and regulatory scheme when handling this CINA case?

3. Was Mother provided effective assistance of Counsel?

Appellant Father presents the following question:

1. Did the court err in finding J.R. to be a CINA when he was not at substantial risk of harm and his parents are willing and able to give him proper care and attention?

For the following reasons, we affirm in part and vacate in part.

**FACTUAL AND PROCEDURAL BACKGROUND**

*History of Family and the Department's Concerns*

J.R. was born on September 12, 2018 to Appellants (Appellant Mother and Appellant Father). J.R. is the fifth child of Appellant Mother. On May 8, 2015, the Circuit Court for Cecil County terminated the parental rights of the Appellant Mother for three of her children. Foster parents took guardianship over a fourth child without a termination of parental rights. Appellant Father has "a significant criminal history," including a 2006 second-degree murder charge which was pled down to first-degree assault; Appellant Father served 15-years imprisonment for this charge.

On two consecutive days in mid-October of 2018, Appellants brought one-month-old J.R. into the emergency room. Appellant Father dropped Appellant Mother and J.R. off at the hospital but did not stay. Appellant Mother reported that J.R. had trouble breathing two nights in a row. However, Appellant Mother was "freaking out," having panic attacks and was more concerned with Appellant Father coming back to the hospital than what was happening with J.R. On October 15, 2018, the Cecil County Department of Social Services ("CCDSS" or "the Department"), the Appellee, received a referral concerning medical neglect, which included J.R.'s "inadequate weight gain" and Appellant Mother's behavior. CCDSS assigned a child protective services ("CPS") investigator with the Department, Ms. Christine Clouser ("Ms. Clouser"), to conduct a joint investigation with the local police department.

2

*First Attempts of Contact with Appellants*

On October 16, 2018, Ms. Clouser made her first attempt to contact Appellants at their primary residence. However, because Appellant Mother had a "lookout" near the home, no one answered the door when Ms. Clouser knocked. The next day, on October 17, 2018, a male resident at the home permitted Ms. Clouser and a police detective to enter the home, but they (Ms. Clouser and the detective) could not access the bedroom where Appellants were staying. While checking the remainder of the home, Ms. Clouser and the detective found the home "to be in poor and unsafe conditions for an infant." Specifically, Ms. Clouser observed a room that was so infested with bedbugs that the male renter could not even sleep in the room. This room infested with bed bugs was within approximately 10 feet of the locked bedroom where J.R. stayed. Additionally, Ms. Clouser noticed that there were no "bottles, formula, baby items, clothing[,] diapers or any items necessary for the care of infant [sic] anywhere in the home."

A female resident informed Ms. Clouser that "[Appellant Father] was aware that the detective and CPS had come to the house the previous day and he ordered everyone in the home not to answer the door under any circumstances and keep the door locked at all times." She reported that Appellants would not stay in the house during business hours so that CPS could not find them. The female resident also provided information that Appellant Father [is] "very violent" and had threatened "to hurt [Appellant Mother] enough to kill the baby when she was pregnant." Further, she indicated that Appellants were using drugs,

3

and particularly, Appellant Father sells "heroin and crack." The female resident advised that she had personally witnessed Appellants "nodding out" while taking care of J.R.

In another attempt to visit Appellants, Ms. Clouser showed up to one of J.R.'s scheduled pediatric appointments on October 19, 2018. However, Appellants did not show up for the appointment. Ms. Clouser and the detective then showed up at Appellants' home. Ms. Clouser and the detective reported that they heard what they believed to be Appellant Father yelling, but when they knocked on the door, it got quiet and two male residents answered the door, stating that the Appellants were not home.

### First Safety Plan

Two days later, on October 22, 2018, Appellant Father called the detective and invited her and Ms. Clouser to the home. When they arrived at the home, Ms. Clouser and the detective noted the strong smell of fresh paint in the room Appellants were staying in, but the room was clean, full of baby supplies, including diapers, wipes, clothing and formula. Appellant Mother first denied that she was aware of concerns regarding J.R.'s weight, but then detailed the medicine J.R. was taking, his current feeding schedule, his digestive problems and his medical appointments. The detective was permitted to walk around the home and noted the bedbug-infested mattress had been covered with a blanket, but the home had otherwise been cleaned up. Appellant Father then demanded that the CPS investigation be closed. Ms. Clouser informed Appellants that there were concerns of substance abuse, and they both denied the allegations, with Appellant Father noting that he was on parole and was having regular urinalysis screens. Nevertheless, Ms. Clouser requested that Appellants submit drug tests by the end of the day, and they agreed.

4

Additionally, Ms. Clouser stated that she wanted Appellants to enter into a safety plan, designed to address concerns of "substance abuse, domestic violence, the inappropriate conditions of the home and J.R.['s] medical needs." Appellants agreed to:

> Allow the department to see [J.R.] in person in order for the department to be able to ensure his safety and wellbeing . . . stay in contact with the department during the investigation . . . not use substances while caring for [J.R.] [and] [J.R.] would remain in a home free of substance use and will be in an appropriate placement . . . follow up with [J.R.'s] medical needs and appointments [and] [J.R.] would not be in any of the rooms that were inappropriate at Appellants' primary residence

Appellants signed this safety plan. They also submitted to drug screens later that day.

### *Violation of the First Safety Plan and Implementation of the Second Safety Plan*

On November 8, 2018, Ms. Clouser received the results of Appellants' drug tests. While Appellant Mother's oral and urine screens were negative, Appellant Father's oral screen was positive for amphetamines and methamphetamines. Ms. Clouser and the detective returned to Appellants' home, but a male resident refused to open the door, stating that the Appellant Mother was at work, and Appellant Father and J.R. were not home. Ms. Clouser and the detective then went to Appellant Mother's job and was told that she was not there. They returned to Appellants' home to wait for them there.

Approximately one hour later, Appellant Father emerged from the home. Appellant Father was "agitated and yelling . . . accus[ing] [Ms. Clouser] of lying during [their] first contact with him." A few moments later, Appellant Mother exited the home with J.R., also argumentative, claiming "she did not know there were allegations of domestic violence until she observed the safety plan." Due to Appellant Father's "aggressive tone," the detective requested backup assistance from the police department. Appellant Father

5

eventually admitted that they were at home when Ms. Clouser and the detective first arrived.

Ms. Clouser then informed Appellants that she had received the results of the drug screen, and Appellant Father's oral screen came back positive for amphetamines and methamphetamines. Ms. Clouser told Appellant Father that this positive drug screen violated the safety plan dated October 22, 2018. She also advised that due to the Appellants' lack of cooperation earlier in the day, a new safety plan would need to be put into place. Appellant Father became agitated again and stated that he believed the positive drug screen was due to his use of Sudafed. Appellant Mother signed the new safety plan, but Appellant Father did not. Ms. Clouser asked Appellant Father to submit to another drug test the following day on November 9, 2018 at 10:00 am, and he stated he would go at 11:00 a.m. Nonetheless, the new safety plan that was put into place stated:

> [J.R.] will not return to [Appellants' primary residence] until further notice. [Appellant Mother] will be the primary caregiver to [J.R.] until further investigation. [J.R.] will have no contact with [Appellant Father] until further investigation. [Appellant Mother] will stay in contact with the department and follow up with [J.R.'s] medical needs. [J.R.] will reside at an [alternate residence in] Elkton, MD[3] until further notice. [Appellant Father] will take a drug screen on November 9, 2018. The department will be able to have face to face contact with [J.R.] in order to assess him. [Appellant Mother] will contact the department if [J.R.] will be residing anywhere other than [the alternate residence].

---

[3] Because Appellant Father could not have contact with J.R. and Appellant Father resided at Appellants' primary residence, Appellant Mother and J.R. could not live there pending the investigation. The alternate residence is the address of a friend of Appellant Mother's where she and J.R. would be staying.

6

Appellant Father did not take the second drug test on November 9, 2018. On December 5, 2018, Ms. Clouser and the detective engaged Appellant Father at his home. Appellant Father accused the department of "kidnaping his son" and "unlawfully [taking] away his parental rights." Ms. Clouser explained to Appellant Father that the safety plan was used to further assess safety concerns, and that if he was willing to cooperate, and take another drug test, they could change the safety plan at any time. Appellant Father's speech was "slurred," he refused to take a drug screen at that time and stated that he was "not willing to work with the department anymore and wanted a court case." The following day, Ms. Clouser and the detective were able to get in touch with Appellant Mother at the alternate residence. Appellant Mother reported that J.R. was no longer considered to be "failing to thrive" and talked about updates regarding his recent appointments and his weight gain. Ms. Clouser requested that Appellant Mother take another random drug test on December 7, 2018, and she agreed.

***Allegations of Domestic Violence and Violation of the Second Safety Plan***

On December 19, 2018, Ms. Clouser received information that Appellant Mother had a black eye. Ms. Clouser and the detective visited Appellant Mother at her job to investigate the allegation. When they met with Appellant Mother, they noticed that her "left eye was bruised, black and purple in color . . . ." When asked about what happened to her eye, Appellant Mother indicated that she and Appellant Father were fixing the bed at their main residence and "a piece of wood bounced up and hit her in the eye." When further questioned about the details, Appellant Mother became disturbed, stating, "why do you continue to ask me stupid questions." Ms. Clouser inquired about J.R. and Appellant

Mother stated that he was with her step-brother on the Maryland/Pennsylvania line. Ms. Clouser requested to see J.R. that day, refusing to set up a meeting for the next day and asked for the step-brother's contact information. Ms. Clouser was able to get in contact with the step-brother's wife, B.W., who resided in Pennsylvania.

When B.W. spoke with Ms. Clouser on the phone, her voice was "shaky." She confessed that Appellant Mother had "asked her to lie but she couldn't lie." B.W. stated that J.R. had been with her for the past two weeks and she had concerns that he was going through "withdrawal." She said that during her first two days with J.R., he would "shake." B.W. admitted that on December 15, 2018, she picked the Appellants up and brought them to her home to visit J.R. She noted that they argued on the way to her home, and at 2:00 a.m. that night, they were "yelling and screaming" at each other in her basement. B.W. mentioned that due to a video camera in her basement, she could see them shoving each other while J.R. was nearby. B.W. reported that as Appellants were escorted out of her house and into the garage, Appellant Father mentioned that Appellant Mother was "on dope" at the time and had taken "6," to which Appellant Mother replied, "she had only taken '1.'" In the garage, Appellants continued to yell and scream, and Appellant Father alleged that Appellant Mother threw a hammer at him. B.W. then put them in her car and drove them back to Cecil County. During the ride, B.W. indicated that they were "shoving each other to the point her car was shaking." B.W. pointed out that she looked into the backseat and saw Appellant Father's "hand leave [Appellant Mother's] face . . . and [Appellant Mother's] eye instantly swelled." At some point, B.W. had to pull over and

8

asked one of them to move to the front seat, and they continued to yell and scream at each other.

At this time, Ms. Clouser explained the Interstate Compact on the Placement of Children ("ICPC"). Ms. Clouser asked if B.W. would meet her and the detective in Maryland with J.R. so that she [Ms. Clouser] could assess J.R. B.W. agreed and J.R. was brought back to the department. The detective reached out to Appellants for them to come to the police department to meet with herself and Ms. Clouser. Initially, they declined, but the detective continued to reach out to them, and they eventually agreed to meet. Appellants were advised that due to new concerns of substance abuse and domestic violence, in addition to violations of the second safety plan, J.R. was being removed and placed into foster care.

***The First Shelter Care Hearing: December 21, 2018***

On December 20, 2018, CCDSS filed a CINA Juvenile Petition, in addition to a Petition for Continued Shelter Care. The next day, on December 21, 2018, the juvenile court held a shelter care hearing. According to an agreement reached by all parties, J.R. was placed "in the sole custody of [Appellant Mother]" as stated in the Order Controlling Conduct. Under the order controlling conduct, Appellant Mother and J.R. would reside at an alternate residence; Appellant Father would not be permitted at the alternate residence; Appellant Father would be permitted to have visitation with J.R. at Open Doors; CCDSS would have access to J.R. at all times; and daycare for J.R. would be provided by Appellant Mother's aunt, V.W. The court granted the order controlling conduct pending the adjudicatory hearing scheduled for January 15, 2019.

9

Immediately after the shelter hearing, Ms. Clouser assessed the alternate residence and found it to be suitable for J.R. to reside there. Ms. Clouser attempted to get a hold of Appellant Mother to return custody of J.R. to her. However, Appellant Mother could not be reached. Ms. Clouser called multiple times and left voicemails, but Appellant Mother did not call or make arrangements to regain physical custody of J.R. until the day after Christmas. Appellant Mother stated that she didn't know where her phone was and that it had stopped working. J.R. was returned to Appellant Mother on December 26, 2018.

On December 27, 2018, Pennsylvania's Child Welfare Authorities contacted CCDSS, regarding J.R. "residing at a place of known drug activity, namely [Appellant Mother's] step-brother's home." On January 2, 2019, investigators sought to check on J.R. and were advised by V.W. that J.R. had been dropped off at West End Garden Apartments at the request of Appellant Mother. Ms. Clouser met Appellant Mother and J.R. in an apartment unit, and Appellant Mother informed Ms. Clouser that she would be returning to the alternate residence that evening. Because Ms. Clouser saw that J.R. was clean and appropriately dressed, she determined that J.R. could remain in Appellant Mother's care at that time, even though she noted some "blue baggies" at the doorstep, which are commonly used to carry heroin.

### *Violation of the Order Controlling Conduct dated December 21, 2018*

Within a week, Ms. Clouser again followed up with Appellant Mother on January 9, 2019 at the alternate residence and Appellant Mother advised investigators that J.R. was in the care of a Ms. R. Appellant Mother did not know Ms. R.'s last name, phone number or address. The next day, once Ms. Clouser contacted Ms. R., who lived at 182

Hollingsworth Manor, she was informed that J.R. had been dropped off with Ms. R. at noon on Friday, January 4, 2019 and was there until Sunday, January 6, 2019. As stated by Ms. R., "[Appellant Mother] brought some provisions, and medicine, but there were no sleeping arrangements. [Appellant Mother] advised that [J.R.] could just sleep in his car seat." Ms. Clouser then left Hollingsworth Manor, but soon returned to that location after learning that Appellant Father had been arrested for "trespassing at Wawa." When Ms. Clouser returned, J.R. was present, having been dropped off by Appellant Mother who "had to go take care of a situation." At this time, Ms. Clouser went to the police station, where she questioned Appellant Mother concerning her whereabouts on New Years' Eve. Appellant Mother confessed that she spent the night at a Knight's Inn with J.R. and Appellant Father. As a result of the violation of the order controlling conduct dated December 21, 2018, J.R. was removed from Appellant Mother's custody and placed with a non-relative foster care provider.

*The Paternity Matter[4]*

At the adjudicatory hearing on January 15, 2019, which was part of the initial Shelter Care Order, it was discovered by the department through receipt of a marriage license that Appellant Mother was married to a man, R.C. ("Mr. C.") at the time of J.R.'s birth. It was revealed that Appellant Mother had been married to Mr. C., who was an inmate in Okanogan County Jail, since March of 2003. J.R. was born in September of 2018. Hence, since "[a] child born or conceived during a marriage is presumed to be the legitimate child

---

[4] The child's paternity is not at issue on this appeal but is important to mention because it was the cause of the delay in the adjudicatory proceedings.

11

of both spouses," Mr. C. was presumed to be J.R.'s father. Md. Code Ann., Est. & Tr. § 1-206(a). Consequently, CCDSS filed an amended petition, listing Mr. C. as J.R.'s father and moved to strike Appellant Father as a party to the CINA proceeding. Subsequently, the juvenile court "found good cause to continue the CINA adjudicatory hearing to permit the parties to respond to the Department's motion." Without objection, the court also continued foster care of J.R.

At the February 5, 2019 hearing, all of the parties submitted memoranda of law regarding the matter of J.R.'s paternity. After arguments, the juvenile court proposed that Appellants complete paternity testing, as they "had already volunteered to do," and requested that the Department acquire more information on Mr. C. Appellant Father asked that J.R. be returned to him pending the investigation into J.R.'s paternity, and the court denied this request, continuing the order of shelter care and placing J.R. with foster parents under an order controlling conduct.

The results of the genetic testing determined that "[Appellant Father] could not be excluded as J.R.'s father]." However, at the March 5, 2019 adjudicatory hearing, "The court stated that it needed to follow the law and go through the proper procedure regarding paternity of J.R." This included Mr. C. being notified of the proceedings and being offered the opportunity to obtain counsel. At the end of the hearing, the juvenile court issued an amended order controlling conduct, continuing J.R.'s shelter care.

During the April 23, 2019 adjudicatory hearing, the Department continued to assert that Appellant Father should be excluded from the proceedings. The juvenile court found that it had jurisdiction to determine paternity in CINA cases, and the marital presumption

had been refuted by genetic testing that concluded there was a 99% probability that Appellant Father was the biological father of J.R. Nevertheless, the court found "good cause" to continue the adjudicatory hearing, over Appellants' objection, as the Department's main witness, Ms. Clouser, was at a funeral.

### *The May 7, 2019 Adjudication and Disposition Hearings*

The juvenile court held an adjudication hearing on the merits of the CINA petition on May 7, 2019. During this hearing, the court first addressed the Department's motion as to whether Appellant Father had disestablished the presumed paternity of Mr. C., consistent with the Estate and Trust Article. In relying on the April 23, 2019 ruling, the court found that Mr. C. had in fact been disestablished as father and acknowledged that Appellant Father had standing to be a part of the hearing. The court proceeded with the adjudication and heard testimony from Ms. Clouser as a witness for the Department. Ms. Clouser testified to the facts as summarized *supra*.[5] The safety plans from October and November were admitted and the court took "judicial notice" of the December 21, 2018 shelter care proceeding. Neither Appellants nor the representative for J.R. presented evidence or gave testimony. After testimony was given, the juvenile court sustained many of the allegations in the amended CINA petition, and at the close of these proceedings, the court found that:

> Parents have repeatedly violated the terms of Safety Plans, and an Order Controlling Conduct that was imposed by the court, with the parents agreement at the Shelter Care hearing; Child has been left with various caregivers at various locations, without notice to the department, which was conducting an active investigation into the welfare of the child, and Parents

---

[5] Ms. Clouser was not able to testify about what she was told by one of the male renters, and another female renter, as there was an objection for hearsay, which was sustained. However, this information was in the report that the presiding judge had.

have demonstrated an unwillingness to cooperate with the Department in regard to care of the child.

The juvenile court found J.R. to be a CINA due to neglect and placed him with CCDSS. Appellants were ordered to participate in several treatment counseling services (drug & alcohol, psychological evaluation, parenting evaluation and domestic violence evaluation). It is from this order that Appellants separately filed this appeal.

## DISCUSSION

## A. Parties' Contentions

Appellant Mother argues that the legislative scheme concerning this CINA case was not followed by CCDSS or the juvenile court. Specifically, she claims the safety plans that were implemented on October 2, 2018 and November 8, 2018 by CCDSS were not authorized by the statute and were in fact "illegal." Appellant Mother contends that the December 21, 2018 orders were contradictory and did not follow the statutory scheme, according to Cts. & Jud. Proc. § 3-815. Appellant Mother submits that the subsequent orders of controlling conduct issued on January 15, 2019, February 5, 2019, March 5, 2019 and April 23, 2019 were erroneous and did not follow the statutory provisions in continuing J.R.'s "shelter care" beyond the 60-day timeframe set in Cts. & Jud. Proc. § 3-815(c)(4). Appellant Mother argues that the court combined the disposition hearing with the adjudication hearing, in violation of Cts. & Jud. Proc § 3-819(a)(1). Furthermore, Appellant Mother alleges that she received ineffective assistance of counsel, because her counsel at trial did not object to the illegality of the safety plans or to any of the juvenile court's findings regarding shelter care. Appellant Mother adopted Appellant Father's arguments

14

regarding J.R. being found CINA.

Appellant Father asserts that the juvenile court erred by finding that J.R. was a CINA because J.R. was not in substantial risk of harm and Appellants were willing and able to give J.R. the proper care and attention he needed. Appellant Father adopts Appellant Mother's arguments regarding the shelter care orders and the disposition hearing.

Appellees (Representatives for the Child and the Department) contend that the juvenile court properly concluded that J.R. was a CINA due to domestic violence in the home, Appellants' use of illegal substances, and their failures to abide by the safety plans utilized to provide for J.R.'s safety. Appellee (the Department) also states that Appellant Mother's appeal of the shelter care order and orders controlling conduct are moot, or in the alternative, were not preserved for appellate review. Additionally, the Department argues that Appellant Mother did not meet the burden of the two-prong test outlined in *Strickland v. Washington*[6] as to whether her trial counsel's performance was deficient and prejudicial, resulting in ineffective assistance of counsel. The Department reasons that Appellant Mother's trial counsel's actions regarding the safety plans, the shelter and conduct orders and the dispositional hearing "was a matter of trial strategy," which is afforded "a heavy measure of deference." *Strickland*, 466 U.S at 691.

---

[6] 466 U.S. 668 (1984).

**B. Standard of Review**

There are "three distinct but interrelated standards of review" applied to a juvenile court's findings in CINA proceedings. *In re Adoption/Guardianship of H.W.*, 460 Md. 201, 214 (2018). The juvenile court's factual findings are reviewed for clear error. *In re Adoption/Guardianship of Amber R.*, 417 Md. 701, 708 (2011). Whether the juvenile court erred as a matter of law is determined "without deference;" if an error is found, we then assess whether the error was harmless or if further proceedings are required to correct the mistake in applying the relevant statute or regulation. *In re Yve S.*, 373 Md. 551, 586 (2003). Finally, we give deference to the juvenile court's ultimate decision in finding a child in need of assistance, and "a decision will be reversed for abuse of discretion only if 'well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.'" *In re J.J.*, 231 Md. App. 304, 345 (2016), *aff'd,* 456 Md. 428 (2017), *cert. denied*, 139 S.Ct. 310 (2018) (quoting *In re Yve S.*, 373 Md. at 583-584 (internal citations omitted).

**Analysis**

*Legality of Safety Plans*

There were two safety plans put in place by CCDSS – on October 22, 2018 and November 8, 2018 – in response to the referral received by the Department regarding the potential medical neglect of J.R. Appellants' violations of terms within the two safety plans triggered the Department's filing of the CINA Juvenile Petition. Appellant Mother argues that these safety plans are illegal, as they are not defined in any part of the statute governing CINA cases. We will agree with Appellant Mother that the legality of safety plans is an

16

issue of first impression for this Court but will otherwise wholeheartedly disagree with their contention that safety plans are illegal. We now discuss the relevant legislative history that has sanctioned the general use of safety plans, as well as the applicable changes in child welfare policies that led to the already nationally accepted practice being statutorily authorized in Maryland.

a. Relevant Federal Legislative History for Child Health and Safety

Well before the inception of safety plans being added to the Family Law Article as part of the short-term, "alternative response" to ensuring the health and safety of children, the federal government approached the issue of children's general welfare by addressing the longstanding number of children in the foster care system. *In re James G.*, 178 Md. App. 543, 580 (2008) (citing Kathleen S. Bean, *Reasonable Efforts: What State Courts Think*, 36 U. Tol. L. Rev. 321 (2004–2005)) ("Bean"). In 1997, Congress enacted the Adoption and Safe Families Act of 1997 ("ASFA"), Pub. L. No. 105-89, 111 Stat. 2115 (codified in 42 U.S.C. Chapter 7, subchapters IV-B and IV-E). The purpose of ASFA was to "streamline the foster care placement process and provide permanent homes for children in foster care, by expediting permanency planning hearings and TPR proceedings." *In re James G.*, 178 Md. App. at 580 (citing *In re Karl H.*, 394 Md. 402, 421 (2006)). ASFA served as a revision of the "reasonable efforts" provision of the Adoption Assistance and Child Welfare Act of 1980 ("AACWA"), which required states to make "reasonable efforts" in reunification services for foster care placement. *In re James G.*, 178 Md. App. at 575 (internal citations omitted). However, "agencies were engaged in excessive efforts to 'repair hopelessly dysfunctional families. Instead of the permanency intended by the

17

federal reasonable efforts clause, impermanency resulted.'" *Id.* at 575 (citing Bean, 36 U. Tol. L. Rev. at 326). The concern became that "children were being reunited with parents when it was not safe to do so in the name of 'reasonable efforts.'" *Id.*

Congress's intent with ASFA was to "clarify 'reasonable efforts' and respond to concerns that AACWA had encouraged states to go too far in preserving parent-child relationships that were more harmful than beneficial." *In re James G.*, 178 Md. App. at 576 (quoting Bean, 36 U. Tol. L. Rev. at 326). Pursuant to Title IV-B and IV-E of AACWA, as revised through ASFA,

> In order to receive federal funding, a state [was] required to implement a federally-approved state plan for the delivery of child welfare services, which, in relevant part, must provide that "reasonable efforts shall be made … to make it possible for a child to safely return to the child's home," *if* such efforts are consistent with the permanency plan for the child. 42 U.S.C. § 671(a)(15)(B). However, ASFA also mandates that, "in determining reasonable efforts to be made with respect to a child ... and in making such reasonable efforts, *the child's health and safety shall be the paramount concern*."

*In re James G.*, 178 Md. App. at 576 (citing 42 U.S.C. § 671 (a)(15)(A))[7] (emphasis added). Complying with federal funding requirements, Maryland adopted ASFA through HB1093 in 1998, asserting that this bill "declares a legislative finding that the purpose of state adoption and guardianship law is to provide children with stable homes that protect their safety and health." Dep't Leg. Servs., *Fiscal and Policy Note (rev.), House Bill 1093*, at 1

---

[7] 42 U.S.C. § 671 is currently being challenged as unconstitutional and not severable from 26 U.S.C. § 5000A(a) by States and private individuals against the United States regarding the constitutionality of the Affordable Care Act's (ACA) individual mandate, as amended by the Tax Cuts and Jobs Act (TCJA). *See Texas v. United States*, No. 19-10011 (5th Cir. argued July 9, 2019).

(1998 Session); *see also* 1998 Md. Laws, ch. 539. Additionally, The Child Abuse Prevention and Treatment Act (CAPTA), which was first enacted in 1974 and is considered "key legislation addressing child abuse and neglect," provides funding to states that "advance, improve and implement safety assessment tools and protocols." *See* U.S. DEP'T HEALTH & HUM. SERVS*., About CAPTA: A Legislative History* (2019); U.S. DEP'T. OF HUM. RESOURCES, SSA-CW # 15-21, *Maryland's Safety Assessment for Every Child (SAFE-C) and Safety Plan*, at 2 (2015) ("SSA-CW # 15-21").

Through the framework of federal legislation, Maryland has established, amended and reinforced its (or the State's) regulations and statutes to improve outcomes for children who interact with the child welfare system. The Department of Human Services, along with other partnering agencies, are tasked with implementing social services that comply with Titles IV-B and IV-E, CAPTA, and other federal provisions. These social services are provided through a variety of approaches, including safety assessments, which allow "for uniform documentation of factors that may indicate an immediate danger to a child and development of a plan by the local department and the caregiver to address the danger." SSA-CW # 15-21, at 2. Safety plans, the implementation of which is nationally recognized, have been one of the numerous mechanisms the Department uses to respond to referrals of abuse or neglect, and has been for several decades in Maryland. *See generally In re Justin D.*, 357 Md. 431, 434 (2000) ("Following an investigation, DSS devised a safety plan calling for [child's] temporary removal from the home, individual family counseling, and further monitoring."); *In re Adoption/Guardianship No. T00032005*, 141 Md. App. 570, 604 (2001) ("The court observed that Ms. H. entered several service agreements and safety

plans between August 4, 1995, and November 22, 1999."); *In re Damien F.*, 182 Md. App. 546, 558 (2008) ("Ms. B. signed a safety plan proposed by the Department . . . ."). However, it was through the state legislature, persuaded by national studies conducted by federal agencies to identify the most appropriate way to handle the evolving nature of child welfare, that Maryland's statutes now endorse the use of safety plans to tackle concerns of child abuse or neglect.

  b.  <u>Relevant Statutory Development of Maryland Family Law Article § 5-706</u>

Title 5 of the Maryland Family Law Article articulates the Department's obligation and authorizes its power to act for the general welfare of children. The principal objective of Subtitle 7 of this Article, as promulgated by COMAR 07.02., is to "protect children who have been the subject of abuse or neglect" by requiring, among other things, that "each local department [] give the appropriate service in the *best interest* of [an] abused or neglected child". Md. Code Ann., Fam. Law ("FL") § 5-702(5) (emphasis added). FL § 5-706 details the process in which CPS uses to investigate reports of suspected abuse or neglect. *See* FL § 5-706 *et seq*. Before 2012, CPS employed what was referred to as a "traditional response" to these types of allegations, and the investigation that was outlined in FL § 5-706 served as an "adversarial intervention in which determining who is responsible for the alleged abuse or neglect [was] the primary mission." Dep't Leg. Servs., *Fiscal and Policy Note (rev.), House Bill 834*, at 5 (2012 Session) ("Fiscal and Policy Note (rev.) to HB 834").

However, CPS agencies were "[f]aced with a large volume of reports, increasingly complex cases, and strained resources," and so they "developed practices and policies to

20

differentiate how particular cases are handled." Lisa Merkel-Holguin, et al., AM. HUMANE ASS'N. & CHILD WELFARE LEAGUE OF AM., *National Study on Differential Response in Child Welfare* 9 (2006). The national study report completed in 2006 detailed how "alternative response programs" – "an intervention . . . that provides assessment and refers families to supportive services rather than initiating an investigation" – were used in 15 other states around the country. Fiscal and Policy Note (rev.) to HB 834, at 4-5. The U.S. Department of Health and Human Services continued this research with a report in 2008, and the consensus was that both reports documented "positive results that lead to increased safety for children and a higher number of children that could safely remain with their families." HB 834 Fiscal and Policy Note, at 5; *See* U.S. DEP'T HEALTH AND HUM. SERV'S, *Differential Response to Reports of Child Abuse and Neglect* (2008).

Meanwhile, during the 2006 session, the Maryland state legislature sought to create a "differential response" to allegations of child abuse or neglect. Fiscal and Policy Note (rev.) to HB 834, at 5. The legislature directed the Department of Human Resources ("DHR") to establish a plan to implement and evaluate the state's current response system and recommend statutory changes. *Id*. Within the year, DHR was instructed to "develop a pilot program for differential response, limited to three jurisdictions." *Id.* By 2008, through HB 262, DHR was proposing "implementation of an alternative response program on a statewide basis." *Id.* However, HB 262 did not receive a favorable report from the House Judiciary Committee due to fiscal and administrative concerns regarding DHR's capacity to "overhaul" child protective services. *Id.* Nevertheless, in August of 2009, DHR assembled a working group consisting of representatives from "academia, the courts, law

21

enforcement, health and community service providers, child advocates and social services professionals" to develop a process to execute a differential response pilot program in furtherance of the successful approach outlined in the national studies conducted in 2006 and 2008. *Id.*

A similar bill to the 2008 proposal, HB 137, also received an unfavorable report from the House Judiciary Committee in 2011, but in 2012, HB 834 was passed, and § 5-706 was amended to include extensive language regarding the use of an "alternative response" and the guidelines as to its practice in referrals of child abuse or neglect. Fiscal and Policy Note (rev) to HB 834, at 6; *See* FL § 5-706(a); (l)—(t). With the amendments, FL § 5-706 currently establishes the implementation of an alternative response program, which includes the use of safety plans, and states, in relevant part:

> (a)(1) In this section, "alternative response" means a component of the child protective services program that provides for a comprehensive assessment of:
>     (i) risk of harm to the child;
>     (ii) risk of subsequent child abuse or neglect;
>     (iii) family strengths and needs; and
>     (iv) the provision of or referral for necessary services.
>
> ****
>
> (s) When a report is referred for an alternative response, the local department shall:
>     (2) see the child and the child's parent or primary caretaker within 5 days of receiving a report of neglect;
>     (3) attempt to have an on-site interview with the child's parent or primary caretaker;
>     (4) evaluate the child's home environment;
>     (5) *decide on the safety of the child*, wherever the child is, and of other children in the household;
>
> ****

22

(11) consistent with the assessment and *any* safety or services plans:
(i) render *any* appropriate services in the best interests of the child;
(ii) refer the family or child for additional services; or
(iii) *as necessary* for the safety of the child or other children in the household, *establish a plan to monitor the safety plan and the provision or completion of appropriate services.*

(emphasis added).

Despite not being specifically defined in the Family Law Article, COMAR or any Maryland case law, the plain meaning of the phrase "safety plan" can be inferred from the statute, as specified in FL § 5-706(s)(11)(i), in that the Department is permitted to utilize safety plans as one method of "*any appropriate* services in the *best interest* of the child" when assessing the welfare of the child. (emphasis added). However, safety plans are only approved for low risk, alternate response cases. *See* FL § 5-706(n), (s)(11). In spite of this seemingly narrow boundary, the legislature still gave far-reaching authority to the Department in regard to not only when their corresponding agencies may make use of alternate responses, but also when they can escalate or deescalate their investigations to or from alternatives responses, depending on the circumstances they encounter. According to FL § 5-706(q)—(r):

(q) A report assigned for an alternative response may be *reassigned at any time for an immediate investigation* based on *any* of the following factors and circumstances:
(1) a reassessment of the report or relevant facts;
(2) a determination that the case satisfies a criterion in subsection (p) of this section; or
(3) a family's inability or refusal to participate in the alternative response assessment.

**\*\*\*\***

23

(r) A report assigned for an investigation may be *reassigned for an alternative response at any time* based on:
  (1) a reassessment of the report or relevant facts that demonstrate that the case meets the criteria for an alternative response;
  (2) a determination that accepted services would address all issues of risk of abuse or neglect and child safety; and

(emphasis added).

Even so, the key limiting language in the use of safety plans based on FL § 5-706(s)(11) is "appropriate"; yet there is a wide scope by virtue of deference the legislature gives the Department in determining what is "appropriate", by preceding "appropriate" with "any." Surely, as outlined in FL § 5-706(b), it is the Department who shall conduct a "thorough investigation" of reports of abuse and neglect to protect the health and safety of a child, and through this exploration, CPS is commissioned with making a number of determinations in the best interest of the child. *See* FL § 5-706(s)(11)(i).

c. Analysis

On October 17, 2018, Ms. Clouser went to Appellants' home and found it "to be in poor and unsafe conditions for an infant." The investigator observed a room that was approximately 10 feet from the bedroom where J.R. stayed to be so infested with bedbugs that the male who rented the room couldn't even sleep there. During this visit, Ms. Clouser was informed that Appellant Father was "very violent," had threatened Appellant Mother while she was pregnant with J.R. and sold "heroin and crack." When Ms. Clouser showed up to J.R.'s pediatric appointment on October 19, 2018, Appellants did not show up for the appointment. It is based on these allegations that Ms. Clouser entered into a safety plan with Appellants three days later, on October 22, 2018, to address concerns of substance

24

abuse, domestic violence (which Appellants denied), the inappropriate conditions of the home, and J.R.'s medical needs. Appellants were also required to take a drug test, to which they both agreed. When Appellants voluntarily signed the safety plan, they agreed to a number of terms, including abstaining from using substances while caring for J.R.

On November 8, 2018, Ms. Clouser received a positive drug screen for Appellant Father. Trying to avoid the Department, Appellants ignored Ms. Clouser when she came to their home, but eventually came out, "agitated and yelling." When Appellant Father was notified that he had failed his drug test, he noted that it was because of his use of Sudafed. Ms. Clouser advised Appellant Father to take another drug test the following day and implemented a second safety plan, prohibiting Appellant Father's contact with J.R. "until further notice" due to his positive drug screen. The second safety plan also stated that J.R. would reside at an alternate residence, and Appellant Mother would contact the department if J.R. would reside anywhere other than that residence.

Appellant Father agreed to take a second drug screen but did not appear for the test on November 9, 2018. When Ms. Clouser made contact with him, his speech was "slurred" and he stated that he would not work with the Department and wanted to go to court. After the Department received information on December 19, 2018 that Appellant Mother had a black eye, Ms. Clouser engaged Appellant Mother, who became combative about questioning as to how she got a black eye. Through further investigation, Ms. Clouser learned that J.R. had been in Pennsylvania for the past two weeks with Appellant Mother's step-brother and his wife, and there had been domestic violence between Appellants while

they were in Pennsylvania. Due to these concerns, along with the violation of the second safety plan, J.R. was removed and placed into foster care.

Appellant Mother argues that the no contact term of the second safety plan was without "substantial justification," relying on *In Re Iris M.*, 118 Md. App. 636 (1998). In that case, the Department filed a petition alleging that the daughter had been sexually abused by her father and was a child in need of assistance. *In Re Iris M.*, 118 Md. App. at 640. Subsequently, no contact orders were entered, prohibiting contact between the father and daughter. *Id.* at 640. However, after review of the record and a determination that the daughter likely made up these allegations only after she believed she was going to get in trouble for hanging out with a friend she was prohibited from being with, the no contact order issued by the juvenile court was vacated because "the existing evidence did not support a no contact order." *Id.* at 650.

Notwithstanding that FL § 5-706(s)(11)(i) allows the Department to "render any appropriate services in the best interest of the child," "substantial justification" is not the correct standard for this circumstance. FL § 5-709(c) authorizes temporary removals and states that:

> (c) The representative may remove the child temporarily, without prior approval by the juvenile court, if the representative believes that the child is in serious, immediate danger.

Albeit not the exact word and absent any other instruction regarding the statutory meaning of "serious, immediate danger," the Department defines "imminent danger" as "a situation that presents a serious threat to a child's physical and/or mental well-being and which demands immediate intervention to protect the child." SSA-CW # 15-21, at 2. On the heels

of discovering the residence with a bedbug infestation and allegation of domestic violence, the accusation of drug use was substantiated when Appellant Father tested positive for amphetamines and methamphetamines after he denied drug use. The assertion of domestic violence was then confirmed when Ms. Clouser and investigators saw Appellant Mother with a black eye and was corroborated by her step-brother's wife. Furthermore, Appellants agreed to enter into the first safety plan, agreeing to its terms. Appellant Mother again agreed to the second safety plan, while Appellant Father consented to refuting the allegations of drug use by agreeing to another drug test, which he then failed to attend. Under these circumstances the evidence was sufficient for the Department to believe that three-month-old J.R. was in immediate or "imminent," serious danger, and temporary removal was an appropriate service in the best interest of the child in response to violations of the valid safety plans and the plans' genuine terms.

Appellant Mother also contends that safety plans are only authorized for alternative responses and low risks cases. The amendments to FL § 5-706 outline what cannot be assigned to an alternative response. FL § 5-706(p) states:

> (p) The following reports of suspected abuse or neglect may not be assigned for an alternative response:
>   (1) sexual abuse; and
>   (2) abuse or neglect:
>       (i) occurring in an out-of-home placement;
>       (ii) resulting in death or serious physical or mental injury;
>       (iii) if, in the previous 3 years, the individual suspected of abuse or neglect has been identified as responsible for abuse or neglect as documented in the records of the local department; or
>       (iv) if the individual suspected of abuse or neglect has had one report assigned for an alternative response within the past 12 months or two reports assigned for an alternative response within the past 24 months.

27

Not falling into any of the excluded situations defined above, the facts here suggest that CPS did in fact implement the safety plans not as an "adversarial intervention," but for the sole purpose of ensuring that J.R.'s medical needs were met, consistent with an alternative response. Here, in conformity with FL § 5-706(s)(2-5), as well as § 5-706(c), Ms. Clouser sought to see J.R. and have an interview with Appellants the day after the Department received the referral for medical neglect. The delay in Ms. Clouser's assessment of the referral was due to Appellant Mother having a "lookout" at their home, Appellants instructing other housemates not to open the door for CPS, and even staying away from the home during business hours so that CPS could not find them. Ms. Clouser did an evaluation of the home environment, finding a room heavily infested with bedbugs along with allegations of domestic violence and substance abuse. In deciding the safety of the child, Ms. Clouser entered into the safety plan to address those concerns. During the adjudicatory hearing, the juvenile court noted multiple times that the Department was attempting to use the "least intrusive remedy" in assessing J.R.'s safety. Even if Appellant Mother wanted to refute this Court's conclusion that an alternative response was used here, the statute is very clear that the Department has great latitude in determining whether they will employ an investigation or an alternative response in their evaluation of child abuse or neglect, absent the exceptions found in FL § 5-706(p) or cases determined to fall under FL § 5-706(n).

FL § 5-706(n) does not define "low risk," but Appellant Mother wants us to believe that low risks only encompass alternative response cases where the child will not be removed from the parent's care. This is simply an improper inference, as the statute authorizes the Department to "render *any* appropriate services in the best interests of the

28

child" that is consistent with *any* safety plan put into place. FL § 5-706(s)(11)(i) (emphasis added). Appellant Mother's narrow reading would inhibit the Department in its assessments of what is the best interest of the child and would be in direct contradiction of the discretion given to the Department pursuant to FL § 5-706(q) and (r).

Further, when "ambiguity clouds the precise application of [a] statute, the cardinal rule of statutory construction is to ascertain and effectuate legislative intent." *State v. Bricker*, 321 Md. 86, 92 (1990). As such, "[w]e attempt to divine legislative intent from the *entire* statutory scheme, as opposed to scrutinizing parts of a statute in isolation." *Forbes v. Harleysville Mutual*, 322 Md. 689, 697 (1991) (emphasis added). Here, while "low risk" is not defined, we can glean from the federal legislation cited *supra*, Maryland's adoption of legislature that the health and safety of children be of paramount concern, and the extensive flexibility the Maryland General Assembly has given the Department in making determinations about concerns of abuse or neglect of a child that the legislature intended "low risk" to be within the scope of the Department's judgment regarding whether an alternative response is the appropriate step for the type of abuse or neglect alleged, as supported by FL § 5-706(q)–(r).

It is through the lens of this legislative history and yielding that we hold that not only are safety plans legal, but the terms of the safety plans implemented here were in fact valid.

***The Orders: The Shelter Care Order and the Orders Controlling Conduct***

    a.  <u>Mootness and Preservation</u>

Appellant Mother maintains that the orders resulting from the shelter care hearing dated December 21, 2018 were contradictory and did not follow the statutory scheme. She argues that the juvenile court's findings and the orders controlling conduct implemented at the January 15, 2019, February 5, 2019,[8] March 5, 2019, and April 23, 2019 adjudicatory hearings were erroneous and did not follow the statutory scheme. Before we can determine whether Appellant Mother preserved for review the supposed substantive and procedural errors during the aforementioned hearings, we shall first address the Department's assertion that these arguments are moot because the CINA adjudication has concluded and therefore "supplants the shelter care orders . . . ."[9] It is a long-held fact that a question is moot if "at the time it is before the court, there is no longer an existing controversy between the parties, so that there is no longer any effective remedy which the court can provide." *In Re Karl H*., 394 Md. at 410 (quoting *Att'y Gen. v. Anne Arundel County Sch. Bus*

---

[8] The Honorable Jane Cairns Murray referred to the Order Controlling Conduct during the adjudicatory hearings dated February 5, 2019 and March 5, 2019 as an "Order for Protective Services." While both Appellant Mother and Appellee refer to it as one of the orders implemented in the case, the only types of orders employed here were the shelter care order dated December 21, 2018, and the Orders Controlling Conduct, dated January 15, 2019, February 5, 2019, March 5, 2019 and April 23, 2019.

[9] We note the hearings are being referred to interchangeably as "shelter care hearing" and "adjudicatory hearing" throughout the record. Appellee refers to the December 21, 2018 hearing as a shelter care hearing. However, Appellee then references the subsequent hearings dated January 5, 2019, February 5, 2019, March 5, 2019 and April 23, 2019 as "shelter care hearings", which we believe is incorrect. They were "adjudicatory hearings" that were postponed, pending the paternity conflict. During those hearings, shelter care with the foster parents was continued through orders controlling conduct.

*Contractors Ass'n, Inc.*, 286 Md. 324, 327 (1979)). More importantly, it is well-recognized that once a CINA determination has been made, it supersedes any shelter care orders or orders controlling conduct that directed the transitional care of the child.

The Department supports its argument with analysis from this Court's fairly recent precedent concerning the execution of shelter care orders, *In re O.P.*, 240 Md. App. 518, *cert. granted,* 464 Md. 586 (2019). In that case, we outlined that "continuation of shelter care frequently accompanies a CINA petition, but it is neither a necessary step in a CINA proceeding nor does it constitute part of the CINA determination." *In re. O.P.*, 240 Md. App. at 554-555. We distinguish the purposes of each proceeding, finding that shelter care orders control "where and with whom a child will reside *prior* to the adjudication of the merits of the CINA petition," while CINA determination will find if the child has in fact been abused or neglected and if the parents or guardians have the capacity or willingness to care for the child. *Id*. at 555. We then held that under the collateral order doctrine, denied petitions for continued shelter orders are appealable as interlocutory orders. *Id*. at 552.

Appellant Mother, on the other hand, argues that this Court has considered shelter care issues after the adjudicatory hearing, citing a two-decade old case, *In re Vanessa C.*, 104 Md. App. 452 (1995). Appellant Mother notes that the majority of the shelter care and adjudicatory hearings at issue here took place before the *In re O.P.* decision, and hence, it would be "inappropriate" to deny consideration on this appeal. Appellant Mother contends that this CINA appeal is not moot, as "a controversy" still exists because the juvenile's orders controlling conduct and failure of the shelter care orders meeting the proper standard

31

negatively affected the adjudicatory/dispositional hearing determinations, relying on *In re Joseph N.*, 407 Md. 278 (2009).

While we appreciate the ingenuity of Appellant Mother's arguments, we find their reasoning unpersuasive. Foremost, the issue in *In re Vanessa C.* dealt with whether the Appellant was due custody of her child when she did not receive an adjudication hearing within 30 days of the child being placed in shelter care. *In re Vanessa C.*, 104 Md. App. at 457. That case was less about the merits of the shelter care order, and more about the statutory interpretation of timelines associated with when an adjudicatory hearing should be scheduled in relation to the shelter care order. *Id.* That case is quite different from the circumstances here, where Appellant Mother's argument concerns a procedural and substantive review of the shelter care hearing, along with the orders controlling conduct.

Moreover, *In re O.P.*'s novelty does not replace nor amend the nature of shelter care orders, orders controlling conduct, and CINA proceedings, as prescribed by their respective statutes. Cts. & Jud. Proc. § 3-801(bb) outlines that "shelter care" means "a *temporary* placement of a child outside of the home at any time before disposition." (emphasis added). Cts. & Jud. Proc. § 3-821(a) notes that:

> (a) The court, on its own motion or on application of a party, may issue an appropriate order directing, restraining, or otherwise controlling the conduct of a person who is properly before the court, if the court finds that the conduct:
> (1) Is or may be detrimental or harmful to a child over whom the court has jurisdiction;
> (2) Will tend to defeat the execution of an order or disposition made or to be made under this subtitle; or
> (3) Will assist in the rehabilitation of *or is necessary for the welfare of the child.*

(emphasis added). These two parts of Subtitle 8 concern the short, provisional arrangements for a child during the pendency of a CINA adjudication and disposition. In contrast, Cts. & Jud. Proc. § 3-801(f) states that a "'Child in need of assistance' means a child who requires court intervention because (1) The child has been abused, has been neglected . . . and (2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs." As discussed below, CINA determinations and subsequent orders associated with CINA decisions deal with the *permanent* aspects of a child's custody and care.

In *In re Joseph N.,* the juvenile court issued a permanency plan review hearing order that moved the immediate custody of a child from the Department to the child's father. *In re Joseph N.,* 407 Md. at 292. Not only was this different from the Department's reunification plan, which was for the mother to ultimately gain sole custody, but due to language in the order, it significantly foreclosed the mother's potential of reunification with the child. *Id.* at 293. The mother appealed the order as an interlocutory order, which was dismissed by this Court as moot. *Id.* at 286. On appeal, the Court of Appeals held that "[t]his CINA appeal is not moot because a controversy is alive when the subsequent review hearing order may have been influenced by an error made in the earlier review hearing order." *Id.* at 304. Given that the juvenile court declared that the permanency plan of reunification was purportedly "achieved" when it gave custody to the child's father, the order positioned the mother at a "relative disadvantage" to receiving custody of the child, and the subsequent orders affected the direction of the case, therefore "preclud[ing] the appeal from being moot." *Id.* at 305.

The ruling of *In re Joseph N.* is a narrow one, in that it only applies to the review of a child's permanency hearings, those of which take place *after* a child had been determined CINA. The facts in *In re Joseph N.* are not comparable to those in this case, because the orders Appellant Mother urges us to review were *before* J.R. was determined CINA. Appellant Mother has not been disadvantaged in any way that will preclude her from eventually receiving custody of J.R., considering that orders issued in this case dealt with the *temporary* placement of J.R. The permanency plan review hearing orders in *In re Joseph N.* addressed plans of reunification that had the possibility of excluding the opportunity of one of the parents as it related to the *permanent* custody of the child involved. *See In re Joseph N.*, 407 Md. at 290, 292-293.

This Court, nonetheless, has the authority to determine the merits of a moot issue if "there is an imperative and manifest urgency to establish a rule of future conduct to matters of important public concern. . . ."). *In re J.J.*, 231 Md. App. at 352 n. 15 (quoting *Anne Arundel County School Bus Contractors Ass'n*, 286 Md. at 328). Appellant Mother submits that the illegal use of safety plans is indeed an issue that is imperative, of manifest urgency and of important public concern. We agree, and have discussed the *legality* of safety plans, at length, *supra*. As such, we do not find there to be an existing controversy of "manifest urgency," as J.R.'s out of home placement based on the violations of the second safety plan was in effect valid. Thereafter, an order controlling conduct was issued on December 21, 2018, and was violated by Appellants on December 31, 2018. Shelter care was continued from January 2019 until May 2019 for good cause, because of the paternity matter. There was then a CINA proceeding and disposition that superseded the continued shelter care

orders. For that reason, the issue regarding the merits of the temporary orders is moot, as there is no relief this Court can effectively grant Appellant Mother in regard to orders that are no longer applicable.

Assuming, *arguendo*, this Court entertained the notion that these matters were not moot, Appellant Mother did not preserve these issues for review. *See* 8-131(a). There are no facts here to suggest that Appellants ever raised any issues regarding the orders controlling conduct during the December 21, 2018, January 15, 2019, and February 5, 2019 hearings, let alone considered appealing them. In fact, Appellants consented to Appellant Mother receiving custody of J.R. on December 26, 2018, while Appellant Father got visitation, and then they both violated the order controlling conduct five days later after receiving J.R. back from the Department. Appellant Mother consented to the postponements of the adjudication to resolve the paternity issue on January 15, 2019 and February 5, 2019, after specifically being prompted about questions by the presiding judges during those hearings. During the March 5, 2019 hearing, Appellant Mother stated:

> [Mother's Counsel]: "So I would ask that if the court was inclined to postpone the case that there be either increased visitation or an order placing the child back in her mother's care — or his mother's care.
> [Department's Counsel]: I believe the mother has been visiting, and I don't think the department would have any objection to increasing that.

Subsequently, Appellant Mother's visitation was in fact increased. At the April 23, 2019 hearing, Appellant Mother's counsel advocated that Appellant Mother receive J.R. back, and the Department responded:

> [Mother's Counsel]: Your Honor, that would be our request as well, at the very least under an order of protective supervision or something, so that this

35

child can —— I mean, we're just —— this child is growing up and losing the bond with parents, and child needs to be home.

[Department's Counsel]: Your Honor, I know this case has gone on, but I don't think that is the fault of the department in any way. And I would point out to the court that we started this with an order of protective supervision. That was what happened at the first shelter hearing, the child was returned to the mother and [father] under an order of protective supervision, the terms of which were pretty much immediately violated by the mother and [father], and that's what got the child back into care. So I don't feel that the parents are in a position really to suggest that now we go back to a similar arrangement when they didn't follow through with the initial arrangement, judge.

J.R.'s counsel was also present and supported the Department's position. The juvenile court continued shelter care with the foster parents and set the adjudication two weeks from that date, on May 7, 2019. Appellants never requested either a modification of any of the alleged erroneous orders controlling conduct or filed any exceptions to these orders. We recognize that this very fact gives rise to Appellant Mother's ineffective assistance of counsel claim, discussed *infra*, but we agree with the Department that due to Appellant Mother's failure to challenge the alleged errors associated with the orders during or after these particular hearings, the merits of assumed errors in the orders is not an argument we are required to address, and therefore we decline to review.

***Timeliness of the Investigation***

Family Law § 5-706(h) states:

(h)(1) To the extent possible, an investigation under subsections (c) and (d) of this section shall be completed within 10 days after receipt of the first notice of the suspected abuse or neglect by the local department or law enforcement agencies.
(2) An investigation under subsections (c) and (d) of this section that is not completed within 30 days shall be completed within 60 days of receipt of the first notice of the suspected abuse or neglect.

36

FL § 5-706(h)(1)-(2). The Department received the referral for medical neglect on October 15, 2018. According to the statute, the investigation should have been completed on December 14, 2018. However, the Department did not complete their findings until February 1, 2019. Appellant Mother notes that this timeframe was beyond the statutorily mandated schedule for investigating child abuse or neglect, which unconstitutionally interfered with Appellant Mother's right to raise J.R.

The directive in this statute is "shall." FL § 5-706(h). In *Tucker v. State*, 89 Md. App. 295 (1991), we address the command of "shall" and how it should be interpreted, in light of noncompliance:

> In dealing with statutory commands, including time provisions such as these, courts often speak in terms of whether they are 'mandatory' or merely 'directory'.... The suggestion implicit from such an analysis is that, if the command is 'mandatory,' some fairly drastic sanction must be imposed upon a finding of noncompliance, whereas if the command is 'directory,' noncompliance, will result in some lesser penalty, or perhaps no penalty at all. That, indeed, is really the issue. When a legislative body commands that something be done, using words such as 'shall' or 'must,' rather than 'may' or 'should,' we must assume, absent some evidence to the contrary, that it was serious and that it meant for the thing to be done in the manner it directed. In that sense, the obligation to comply with the statute (or rule) is both mandatory and directory. The relevant question in such a case is whether the sanction sought for noncompliance is an appropriate one.

*Tucker*, 89 Md. App. at 297–98. *See also In re Najasha B.*, 409 Md. 20, 32-33 (2009). Although neither COMAR 07.02.07.09 nor FL § 5-706(h) outlines any sanctions for delays in completing a child abuse or neglect investigation, the statute qualifies the mandate with "to the extent possible." FL § 5-706(h)(1). Appellant Mother did not object at any of the hearings to the timeliness of the investigation and has presented no argument regarding sanctions for this supposed error, other than it was a "harmful error" and an

37

"unconstitutional interference" with Appellant Mother's parental rights, even though they do not justify how. Either way, we disagree.

The constitutional protections in the Fourteenth Amendment that guarantee a parent's right to be free from "undue interference by the state" are notable, but they "are not absolute." *In re Yve S.*, 373 Md. 551, 565, 568 (2003). Even so, we do not see any undue interference by the Department investigating a referral for medical neglect, which led to additional, serious concerns of substance abuse and domestic violence, both of which were validated throughout the investigation. In any event, Appellants were complicit in the prolonging of the investigation, through their avoidance of the CPS investigators, Appellant Father's declarations that he would not work with the Department, and their constant violations of the safety plans and orders controlling conduct.

As a matter of law, the investigation was completed outside of the deadlines set by FL § 5-706(h). However, we find this error to be harmless because the Department investigated the health, safety and welfare of J.R. within a reasonable timeframe, considering the obstacles imposed, in part, by the Appellants.

### Determining J.R. is a CINA

As noted above, a "child in need is assistance" is defined as:

> (f) a child who requires court intervention because:
> (1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and
> (2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs.

Cts. & Jud. Proc. § 3-801(f). The principal focus of the CINA statute is to "ensure that juvenile courts (and local departments of social services) exercise authority to protect and

38

advance a child's best interests when court intervention is required." *In re Najasha B.*, 409 Md. at 33. Juvenile courts, particularly, are "vested" with this far-reaching authority because they:

> see[] the witnesses and the parties, hear[] the testimony, and ha[ve] the opportunity to speak with the child; [the juvenile court] is in a far better position than is an appellate court, which has only a cold record before it, to weigh the evidence and determine what disposition will best promote the welfare of the minor.

*Baldwin v. Bayard*, 215 Md. App. 82, 105 (2013) (quoting *In re Yve S.*, 373 Md. at 585-86). Pursuant to Cts. & Jud. Proc. § 3-801(f), a child may be adjudicated CINA if they have been abused or neglected. The standard that must be employed by the juvenile court in CINA adjudication proceedings is preponderance of the evidence. Cts. & Jud. Proc. § 3-817(c); *see also In re Nathaniel A.*, 160 Md. App. 581, 595 (2005). In determining whether neglect or abuse has occurred, the standard is measured against the totality of the circumstances. *In re Priscilla B.*, 214 Md. App. 600, 621 (2013).

Here, the juvenile court specifically found that there was no abuse but did find that there was neglect. In accordance with Cts. & Jud. Proc. § 3-821(s), "neglect" is defined as:

> (s) "Neglect" means the leaving of a child unattended or other failure to give proper care and attention to a child by any parent or individual who has permanent or temporary care or custody or responsibility for supervision of the child under circumstances that indicate:
>     (1) That the child's health or welfare is harmed or placed at substantial risk of harm; or
>     (2) That the child has suffered mental injury or been placed at substantial risk of mental injury.

In *In re Priscilla B.*, we outlined that:

> [a]lthough neglect might not involve *affirmative* conduct (as physical abuse does, for example), the court assesses neglect by assessing the *inaction* of a

39

parent over time. To the extent that inaction repeats itself, courts can appropriately view that pattern of omission as a predictor of future behavior, *active* or *passive*.

*In re Priscilla B*., 214 Md. App. at 625 (emphasis in original). Appellants assert that there was insufficient evidence for the court to find that J.R. was at a substantial risk of harm. We recognize the "wide discretion concomitant with [the juvenile court's] plenary authority to determine any question concerning the welfare of children", and therefore, disagree with Appellants.

The juvenile court based its findings on the testimony of Ms. Clouser, who testified to various allegations in the amended petition, the demeanor of the witnesses and arguments by counsel. Furthermore, there was more than sufficient evidence to show that while the original referral was for medical neglect, throughout the investigation, new concerns arose that the Department correctly chose to address, i.e. substance abuse and domestic violence allegations, which were corroborated throughout the inquiry into neglect of J.R. The juvenile court took note that J.R. had four older siblings and Appellant Mother does not have care of those siblings. The court recognized that while Appellant Father received a positive drug screen, which had no indication as to whether he had used drugs after he signed the safety plan, the court still found the positive test results "a violation" because there was drug use, which Appellant Father had originally denied before he entered into the safety plan. The juvenile court reiterated that the Appellants had been given three chances to "maintain and keep the child in their home," but through the conduct that violated both the two safety plans and the order controlling conduct, the court found that

there was "failure to give proper care and attention." The court concluded by noting that "every reasonable effort" had been made to keep J.R. with Appellants.

The Court of Appeals has made it clear that "[c]ourts should be most reluctant to 'gamble' with an infant's future; there is no way to judge the future conduct of an adult excepting by his or her conduct in the past." *McCabe v. McCabe*, 218 Md. 378, 384 (1958). We reject Appellants' contention that J.R. was never injured, as "the court need not wait until the child suffers some injury before determining that he is neglected . . . ." *In re Dustin T.*, 93 Md. App. 726, 735 (1992). As we wrote in *In re Dustin T.*, the juvenile court may examine the parents' "track record" to determine if a child is "merely *placed at risk* of significant harm". *In re Dustin T.*, 93 Md. App. at 735 (emphasis in original). The court's factual findings here regarding Appellant's *inaction* to properly care for J.R. reflect that, under the totality of the circumstances, the court did not abuse their discretion in finding that there was in fact a substantial risk of harm to seven-month-old J.R.

### Removal of J.R. from Appellants' Custody

Appellants argue that the court committed harmful error by not adhering to the statutory scheme in conducting an individual disposition hearing, as outlined in Cts. & Jud. Proc. § 3-819, which provides:

> (a)(1) Unless a CINA petition under this subtitle is dismissed, the court shall hold a separate disposition hearing after an adjudicatory hearing to determine whether the child is a CINA.
>> (2) The disposition hearing shall be held on the same day as the adjudicatory hearing unless on its own motion or motion of a party, the court finds that there is good cause to delay the disposition hearing to a later day.

(3) If the court delays a disposition hearing, it shall be held no later than 30 days after the conclusion of the adjudicatory hearing unless good cause is shown.

As a matter of law, we must agree with Appellants.

First and foremost, we acknowledge that Appellants did not preserve for review the argument that the dispositional hearing was not separated from the adjudicatory hearing. Appellant Mother conceded in her opening brief that she failed to preserve the alleged error when she did not "stop[] the juvenile [court] from proceeding directly to disposition" following the adjudicatory hearing and "made no objection to her denial of the opportunity to present evidence" on the dispositional order. Md. Rule 8-131(a) outlines that if an issue does not "plainly appear[] by the record to have been raised in or decided by the trial court," this Court "[o]rdinarily . . . will not decide [the] issue." The principal purpose of Rule 8–131(a) is to "ensure fairness for all parties and to promote the orderly administration of law." *Jones v. State*, 379 Md. 704, 713–14 (2004). However, in extraordinary instances, this rule is not without exception. In rare circumstances, pursuant to Md. Rule 8-131(a), we may exercise our discretion to review an unpreserved issue. *See Bailey v. State*, 464 Md. 685, 698 (2019). However, "[s]uch prerogative to review an unpreserved claim of error ... is to be rarely exercised and only when doing so furthers, rather than undermines, the purposes of the rule." *Robinson v. State*, 410 Md. 91, 103–04, (2009). In *Lewis v. State,* the Court of Appeals outlined:

> We usually elect to review an unpreserved issue only after it has been thoroughly briefed and argued, and where a decision would (1) help correct a recurring error, (2) provide guidance when there is likely to be a new trial, or (3) offer assistance if there is a subsequent collateral attack on the conviction.

42

*Lewis v. State*, 452 Md. 663, 699 (2017) (quoting *Ray v. State*, 435 Md. 1, 22 (2013)). Here, we find no prejudice in deciding to review the unpreserved issue. Not only was the issue fully briefed and argued by all parties, our decision will provide aid to trial courts in applying Cts. & Jud. Proc. § 3-819(a)(2) and *In re Joseph G.*, 94 Md. App. 343, 350 (1993), as discussed below. We find it imperative and beneficial to remind trial courts of the statutory requirement that the adjudication and disposition hearings must be separate hearings. By addressing this unpreserved issue, we advise trial courts about the different standards between adjudication and dispositional hearings, as well as the consequences and prejudices that parents may suffer when they are prevented from taking advantage of the opportunities available to them in dispositional hearings not necessarily available in adjudicatory hearings. Furthermore, this opinion seeks to reinforce precedent concerning a separate disposition hearing, upholding the legislative intent of conserving and strengthening "the child's family ties and to separate a child from the child's parents only when necessary for the child's welfare." Cts. & Jud. Proc. § 3-802(a)(3).

In the instant case, even though the disposition was held on the same day as the adjudicatory hearing, absent any motions of any of the parties and in accordance with Cts. & Jud. Proc. § 3-819(a)(2), the hearing was not separate, as required by Cts. & Jud. Proc. § 3-819(a)(1). We accept Appellants' arguments that there is no indication as to where the adjudication hearing ends and when the disposition starts. Now, we assess if the juvenile court's violation of Cts. & Jud. Proc. § 3-819(a)(1) requires that we mandate further proceedings or if this error is harmless. *In re Yve S.*, 373 Md. at 586.

In *In re Joseph* G., we held that "a more stringent standard of proof is required to deny custody." *In re Joseph G.*, 94 Md. App. at 350. Even if the juvenile court is given great leeway in determining the welfare of minors, they are bound by the legislative framework expressed in FL § 9-101, which describes:

> (a) In any custody or visitation proceeding, if the court has reasonable grounds to believe that a child has been abused or neglected by a party to the proceeding, the court shall determine whether abuse or neglect is likely to occur if custody or visitation rights are granted to the party.

This court acknowledges that "the law permits involuntary separation of a child from his parents only if the parents are unable or unwilling to give the child ordinary care and attention, and even then only if the court finds that the drastic remedy of removing the child is necessary for his welfare." *In re William B*., 68, 73 (1987); *see also In re Beverly B*., 72 Md. App 433, 440 (1987); *see generally In re Jertrude O*., 56 Md. App. 83, 99 (1983) ("the legislature and the Supreme Court have both expressed the view that children should not be uprooted from their family but for the most urgent reasons."). Under this precedent, we find that the juvenile court's error was harmful.

Although the amended petition would have been acceptable for the court to rely on for the purposes of the disposition hearing, *see In re E.R*., 239 Md. App. 334 (2018), the Appellants were not given the opportunity to present evidence as to why they would be able to provide J.R. with the proper care and attention, nor did the court outline specific findings as to why the court felt the need for removal, pursuant to Cts. & Jud. Proc. § 3-819(f). Additionally, Cts. & Jud. Proc. § 3-819(c) lists several alternatives that should have been considered in lieu of awarding custody to the Department. *See also In re Jertrude O*.,

56 Md. App at 99. We further point out that the dispositional order directs Appellants to participate in a number of treatments and evaluations, but the court made no findings as to the basis for these services being ordered. As a consequence, the dispositional order does not correspond with the record.

We therefore vacate the dispositional order which denied the Appellants custody of J.R. and remand the case back to the circuit court for Cecil County, so there can be an immediate and proper dispositional hearing to determine whether Appellants are willing and able to care for J.R., pursuant to Cts. & Jud. § Proc. 3-819.

### *Ineffective Assistance of Counsel*

On a final note, Appellant Mother contends that she received ineffective assistance of counsel throughout the CINA proceedings. Particularly, Appellant Mother alleges that her trial counsel did not object or file exceptions to various procedural errors throughout the CINA proceedings, including the continued shelter care orders or the postponements related to the paternity matter. Appellant Mother also maintains that her counsel failed to raise constitutional due process concerns regarding the safety plans during the CPS investigation.

Statutory rights to counsel in CINA proceedings are outlined in Cts. & Jud. Proc. § 3-813(a) which indicates:

> (a) Except as provided in subsections (b) and (c) of this section, a party is entitled to the assistance of counsel at every stage of any proceeding under this subtitle.

This court observes that "implicit in that right to counsel is that counsel be effective." *In re Adoption of Chaden M*., 422 Md. 498, 510 (2011). In order to evaluate the standard in

45

which we would review ineffective assistance of counsel claims in guardianship proceedings, this court adopted the *Strickland* two-prong test. *Id.* Relying on the jurisdictional comparisons, summarized at length, of the *Strickland* test being utilized in termination of parental rights cases in the *In re Adoption/Guardianship of Chaden M.* opinion written by this Court, we will embrace the *Strickland* two-step test for CINA proceedings as well. *See In re Adoption/Guardianship of Chaden M.*, 189 Md. App. 411, 433 (2009), *aff'd sub nom. In re Adoption of Chaden M.*, 422 Md. 498 (2011).

*Strickland v. Washington* extensively outlines the standard for evaluating the validity of an ineffective assistance of counsel claim, which can be broken down into a "'performance' component" and a "'prejudice' component." *In re Adoption/Guardianship of Chaden M.*, 189 Md. App. at 434 (quoting *Strickland*, 466 U.S. at 690, 694). Essentially, in order to obtain relief for the alleged ineffectiveness, there must first be a showing that "counsel's representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 694. In this instance, review of trial counsel's performance "must be highly deferential." *Strickland*, 466 U.S. at 689. The Supreme Court has further elaborated that review of an attorney's performance is "context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins v. Smith*, 539 U.S. 510, 523 (2003).

After meeting what can be considered a "heavy burden"[10], the one claiming error must then demonstrate that "there is a reasonable probability that, but for counsel's

---

[10] *See Harris v. State*, 303 Md. 685, 697 (1985).

unprofessional errors, the result of the proceeding would have been different . . . ." *Strickland*, 466 U.S. at 689. This prong of the *Strickland* test requires a showing of prejudice, considering that "[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial." *Id*. at 693. Moreover, "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. In Maryland, to establish prejudice, there must be a showing that "but for counsel's errors, there is a 'substantial possibility' the result of the proceeding would have been different." *State v. Borchardt*, 396 Md. 586, 603 (2007) (citing *Bowers v. State*, 320 Md. 416, 426-427 (1990)).

Yet, we recognize that ineffective assistance of counsel claims, at least in criminal cases, often have a separate "post-conviction hearing," considering that "ordinarily, the trial record does not illuminate the basis for the challenged acts or omissions of counsel." *See In re Adoption/Guardianship of Chaden M*., 189 Md. App. at 434-435 (quoting *In re: Parris W*., 363 Md. 717, 726 (2001)). "Post-conviction proceedings are preferred with respect to ineffective assistance of counsel claims because the trial record rarely reveals why counsel acted or omitted to act, and such proceedings allow for fact-finding and the introduction of testimony and evidence directly related to allegations of the counsel's ineffectiveness." *Mosley v. State*, 378 Md. 548, 560 (2003).

While the Supreme Court has examined claims of ineffective assistance of counsel on direct review, it has been only on rare occasions, "where the critical facts are undisputed, the record is sufficiently developed, and/or the legal representation is so egregiously ineffective that it is obvious from the trial record that a defendant was denied his Sixth

47

Amendment right to counsel." *Mosley*, 378 Md. at 561 (citing *Massaro v. United States*, 538 U.S. 500 (2003)); *see also Robinson v. State*, 404 Md. 208, 219 (2008) ("where the critical facts are not in dispute and the record is sufficiently developed to permit a fair evaluation of the claim, there is no need for a collateral fact-finding proceeding, and review on direct appeal may be appropriate and desirable."); *In re Parris W.*, 363 Md. at 726.

Recognizing that the critical facts for the ineffective assistance of counsel claim, i.e. that trial counsel did not object during particular hearings nor raise constitutional due process concerns, are at dispute and there was no separate "hearing" where the trial attorney had the opportunity to explain why they took certain actions during the CINA proceeding, we hold that the record here is not adequately established to examine the ineffective assistance of counsel claim raised by Appellant Mother. Appellant Mother never raised the argument at trial that her counsel was ineffective. There was no effort by Appellant Mother to present evidence that her trial counsel did or did not make certain arguments that she wanted trial counsel to argue in regard to J.R.'s custody during the CINA proceedings. As the Court of Appeals has stated, "the trial record clearly must illuminate why counsel's actions were ineffective because, otherwise, the Maryland appellate courts would be entangled in the perilous process of second-guessing without the benefit of potentially essential information." *Mosley*, 378 Md. at 564. (internal citations omitted). We do not find that the legal representation here is "so egregiously ineffective" that it is apparent from the trial record that Appellant Mother was denied her statutory right to counsel in a CINA proceeding. Therefore, we do not reach the merits of Appellant Mother's ineffective assistance of counsel claim.

**CONCLUSION**

Accordingly, this case is remanded back to the circuit court for Cecil County, sitting as a juvenile court, to immediately conduct a disposition hearing in accordance with the applicable statute. We do not consider Appellant Mother's substantive arguments regarding the ineffective assistance of counsel claim. Otherwise, we affirm.

**JUDGMENT OF THE CIRCUIT COURT FOR CECIL COUNTY AFFIRMED IN PART AND VACATED IN PART. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID ½ BY APPELLANTS AND ½ BY APPELLEE CECIL COUNTY DEPARTMENT OF SOCIAL SERVICES .**